AIRBORNE FREIGHT CORPORATION,
INC., and Cindy Whitson,
Appellants,

v.

C.R. LEE ENTERPRISES,
INC., Appellee.

No. 08–91–00129–CV.

Court of Appeals of Texas,
El Paso.

Dec. 16, 1992.

Rehearing Overruled Feb. 3, 1993.

David M. Pruessner, Fletcher & Springer, L.L.P., Walter G. Pettey, III, Pettit & Martin, Dallas, for appellants.

Paul J. Coselli, Redding, Coselli, Tinsley & Allie, David J. Sacks, Alexander & McEvily, Houston, for appellee.

Before OSBORN, C.J., and KOEHLER and LARSEN, JJ.

## OPINION

LARSEN, Justice.

This case involves a contract dispute, and there's the rub. Plaintiff/appellee C.R. Lee Enterprises obtained a jury verdict against Airborne Freight Corporation, Inc. and Cindy Whitson, Airborne's regional manager (referred to as "Airborne") on a hybrid theory of negligent misrepresentation and fraud; Lee lost two breach of contract claims, one to a negative jury finding and one to summary judgment. We find that because the cause of action here relates only to duties stemming from the contractual agreement between the parties, because the damages proven by Lee relate only to the subject matter of the contract itself, and because the written contract specifically disclaims any reliance on oral representations, no tort cause of action lies. Further, because all breach of contract claims were decided against Lee in the trial court, and these adverse findings are not challenged on appeal, we reverse and ren-

der judgment that C.R. Lee Enterprises take nothing.

## FACTS

This case revolves around a written contractual agreement between Airborne Freight Corporation, Inc. and C.R. Lee Enterprises, Inc., as well as a spoken assurance by Airborne's agent Cindy Whitson.

Airborne is a nationwide express delivery service. Lee Enterprises, owned by C.R. Lee, was an independent contractor for Airborne for over ten years, providing Airborne customers with pickup and delivery services in Houston and East Texas. In August 1987, Lee and Airborne entered into a "Cartage Agreement" which was the contract in effect during the time period at issue.

The Cartage Agreement provided that:

(c) This Agreement may be terminated by either party upon thirty (30) days' written notice, provided that termination pursuant to this subparagraph (c) shall not be effectuated during the 30 day period commencing with the earlier of the effective date of this Agreement or the effective date of any prior Agreement between the parties. Notice given pursuant to this subparagraph (c) need not specify any reason or reasons for the termination.

In addition, the agreement set out this specific disclaimer:

(f) Except as expressly stated in subparagraph (c) above, Contractor agrees that no representations have been made to Contractor about the duration of this Agreement, and Contractor disclaims any reliance on any definite duration of this Agreement, regardless of equipment or other commitments which Contractor may elect to make in order to provide services under this Agreement.

Airborne had similar contracts with other delivery contractors in the Houston area. In late 1988 and early 1989, Airborne terminated its contract with one delivery contractor, Felix Ward, relying upon the 30–day termination clause in the Cartage

Agreement. Also in late 1988 and early 1989, Airborne restricted the contractors' use of subcontracting drivers, requiring that drivers be the employees of the contractors to minimize liability exposure. The delivery contractors (including Lee) realized that this would require additional expenditures for vehicles, employee payroll taxes and benefits and insurance coverage. The contractors therefore sought assurances from Airborne that their contracts were secure, despite the written 30–day termination clauses.

In 1989, responding to the fears of the delivery contractors, Cindy Whitson made the statement "as long as you do your job, you'll have a job." Whitson made this statement to several contractors, several times. C.R. Lee testified that he thought the statement was true when Ms. Whitson made it. Whitson also testified that she made the statement, that it was true when she said it and that it was not much to lean on for business purposes. Whitson admitted that she would make oral changes in the Cartage Agreement from time to time, and she expected her operators to accommodate them. One of these changes was the implementation of LIBRA, a computerized pick-up and delivery system which altered the method by which operators were paid.[1]

In spring 1989, Airborne acquired Compaq Computer as a client and requested that Lee expand to service the contract. Airborne also requested that the 12 noon delivery time required by the Cartage Agreement be improved to 10 a.m. Neither request was in writing. Relying upon Whitson's statement if "you do your job, you'll have a job," Lee Enterprises expanded to meet Airborne's needs. Lee acquired two new employees, leased a new tractor-trailer rig and purchased three 1989 Dodge vans. Lee borrowed $130,000 from First City Bank of Humble to fund the expansion. Lee Enterprises also bought a building previously owned by C.R. Lee and his wife, individually, to use as its business headquarters.

In early 1990, however, Airborne became dissatisfied with Lee Enterprises. There was evidence that at least one of Lee's drivers was stealing freight from Compaq Computers, a major client. There was also evidence that at least one driver was buying and using drugs while delivering for Airborne. Lee also continued to use subcontractor drivers, contrary to Airborne's wishes that all drivers have the status of employees.

On March 7, 1990, Airborne notified Lee Enterprises by letter that it was terminating the Cartage Agreement in accordance with the written contract, effective April 7, 1990. Airborne has relied solely upon the contractual 30–day termination clause as its justification for terminating Lee Enterprises, and has steadfastly maintained that it need not prove Lee was fired for misconduct or other cause, but solely under the "without cause" clause of the Cartage Agreement.

Lee Enterprises filed suit thereafter, alleging breach of contract and tort.

The trial court, in response to a summary judgment motion by Airborne,[2] concluded that the written 30–day termination clause was binding upon the parties, concluding:

1. There were not effective oral modifications to the Cartage Agreement and, therefore, the Cartage Agreement was terminable at will; and

2. Airborne terminated its Cartage Agreement with Plaintiff in accordance with its written terms.

---

**1.** Lee testified that under the LIBRA system, he was losing 9 percent of what he would expect to be paid under the written contractual system. Other witnesses contradicted this testimony, stating that under LIBRA the drivers were actually able to make more deliveries and earn more money. The jury found that the LIBRA system's benefits to the operators outweighed its detriments. They therefore found no damages for Lee's breach of contract claim stemming from implementation of LIBRA. This finding is not challenged by Lee.

**2.** The Cartage Agreement specified that the law of Washington state would apply in construing the contract. The trial judge decided the summary judgment motion accordingly. C.R. Lee does not challenge that decision.

Lee Enterprises went to trial, therefore, on its two remaining theories: that Airborne had breached the Cartage Agreement by altering its payment scheme under the LIBRA system; and that Airborne had made tortious misrepresentations to Lee in the form of the statement "as long as you do your job, you'll have a job." The jury found against Lee on the LIBRA claim, and that portion of the verdict has not been appealed. The jury found for Lee on the tort theory, however, awarding $250,000 in actual damages and $1,000,000 in punitive damages. Judgment was entered accordingly, and Airborne challenges that award.

## JURY FINDINGS

Although both sides of this lawsuit characterize the theory of recovery before this Court as "fraud," that is inaccurate. The trial court actually submitted to the jury a hybrid, broad form question which allowed an affirmative answer if the jury found the elements of either fraud or negligent misrepresentation. The question read:

Do you find that the Defendants defrauded the Plaintiff as the term is defined below?

Answer "Yes" or "No"

Answer: Yes

The Plaintiff has claimed that it has been defrauded and that misrepresentations have been told to it by the Defendants. You are instructed that in order to recover for these the Plaintiff must prove that the Defendants made a false statement of fact to the Plaintiff and that the speaker knew the statement was false or that the party making the representation failed to exercise ordinary care in communicating the information contained in the representation and the speaker intended that the Plaintiff act upon the statement to its detriment. Also, the Plaintiff must not know that the statement was false, must have a right to rely upon it, and must be damaged by that reliance.

In addition, the jury found that Airborne acted with actual malice in defrauding Lee, in response to the following question:

Did the Defendants act with actual malice in defrauding the Plaintiff, as defined in Question No. 4, if you so found?

You are instructed that a person acts with actual malice if he or she makes a statement with knowledge that it is false or with reckless disregard whether it is false or not. Actual malice cannot be inferred from the publication of the facts themselves, even if said facts are false.

Answer "Yes" or "No"

_✓_ Yes

____ No

These are the jury findings upon which the award of actual and punitive damages against Airborne are premised.

The question on actual damages read:

What sum of money, if paid now in cash, would fairly and reasonably compensate the Plaintiff for its damages, if any, caused by the Plaintiff's reliance on the representations, if any? In answering this question, you should not reduce the damages found based on the answers to any other questions.

Answer in dollars and cents, if any:

Answer: $250,000

It is not necessary that earnings and economic benefits be susceptible of exact calculation. It is sufficient if there is evidence from which earnings and economic benefits may be ascertained with a reasonable degree of exactness.

## TORT OR CONTRACT

 The law of "contorts" is a muddy area, devoid of bright line rules or easy answers as to what conduct constitutes a tort, and what a breach of contract. The acts of a party may breach duties in tort or contract alone, or simultaneously in both. The Texas Supreme Court has observed that it is the nature of the injury which is most helpful in determining which duty or duties are breached. When the injury is only economic loss to the subject of a contract itself the action sounds in contract alone. *Southwestern Bell Telephone Company v. DeLanney*, 809 S.W.2d 493, 495 (Tex.1991); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986). Contract obligations arise from a specific

agreement between the parties. Tort obligations, in contrast, are those that are imposed by law—apart from and independent of promises made.[3] *DeLanney,* 809 S.W.2d at 494, quoting W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 92, at 655 (5th ed. 1984).

A promise to do an act (or, in this case, refrain from doing an act) in the future is actionable fraud only when made with the intention, design and purpose of deceiving, and with no intention of performing the act. Plaintiff must show that the promise was false at the time it was made. *Schindler v. Austwell Farmers Cooperative,* 841 S.W.2d 853 (1992); *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex.1986); *Stanfield v. O'Boyle,* 462 S.W.2d 270, 272 (Tex.1971). Although a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. Failure to perform, standing alone, is no evidence of the promisor's intent not to perform when the promise was made. However, that fact is a circumstance to be considered with other facts to establish intent. *Schindler,* 841 S.W.2d at 853; *Spoljaric,* 708 S.W.2d at 434.

To establish a cause of action for negligent misrepresentation, the other theory upon which plaintiff relied, it had to prove the following elements: (1) the representation was made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation. *Federal Land Bank Association of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991). Significantly, the sort of "false information" contemplated in a negligent misrepresentation case is a misstatement of *existing fact.* For example, in *Sloane,* plaintiffs made certain purchases based upon a bank officer's representation that the bank had made an agreement to loan them money, when it had made no such agreement and ultimately rejected their loan application. Similarly, in *Traylor v. Gray,* 547 S.W.2d 644, 648 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.), a cotton ginner represented he had negotiated a contract for the sale of a farmer's cotton crop, when in fact he had not, resulting in a substantial loss to the farmer when the cotton market dropped. In *Cook Consultants, Inc. v. Larson,* 700 S.W.2d 231, 233 (Tex.App.—Dallas 1985, writ ref'd n.r.e.), a

---

**3.** A recent case decided by the Corpus Christi Court of Appeals tackles the same problem presented here. *Goodyear Tire and Rubber Company v. Portilla,* 836 S.W.2d 664 (Tex.App.—Corpus Christi 1992, writ pending). There, Hortencia Portilla was employed by Goodyear for over 20 years. Her brother became her supervisor several years after she was hired, a violation of Goodyear's anti-nepotism policy. Goodyear took no steps to enforce the policy for 17 years. Throughout her employment, Portilla was repeatedly assured that she would keep her job with the company as long as she performed satisfactorily, a pledge remarkably similar to Whitson's statement to Lee. These are "satisfaction contracts," formed when the employer represents to the employee that the employee will only be discharged for unsatisfactory performance. *Portilla,* 836 S.W.2d at 668. *Coker v. Wesco Materials Corporation,* 368 S.W.2d 883, 885 (Tex.Civ.App.—Eastland 1963, no writ).

The jury found that Portilla had an enforceable oral contract, and the appellate court agreed. Ms. Portilla's case differs from this one, however, in that Ms. Portilla had no written contract specifically admonishing the parties not to rely upon verbal modifications. Also in Portilla, significantly, the Court found that Ms. Portilla could not recover for negligent performance of the employment contract. There the Court held:

> We look to the nature of the injury to determine which duty or duties are breached, and when the injury is only the economic loss to the subject of the contract itself, the action sounds in contract alone. [Citations omitted].

The injury Portilla suffered when Goodyear fired her was the loss of her job. No one contends that independently tortious conduct, such as a guard escorting her immediately from the premises, accompanied the discharge. [Citation omitted]. *Her termination was the proposed negligent performance of the contract 'that she would have a job as long as she performed satisfactorily.' Her injury was that created by the breach of contract, i.e., the loss of her job.* *Portilla,* 836 S.W.2d at 671. [Emphasis added].

surveyor erroneously indicated that all improvements were within lot lines, when in fact, the house purchased by plaintiffs encroached on neighboring property by six feet. In *Rosenthal v. Blum*, 529 S.W.2d 102, 104 (Tex.Civ.App.—Waco 1975, writ ref'd n.r.e.), plaintiff was a patient of defendant physician, and claimed that the doctor negligently diagnosed his injuries following an automobile accident, causing plaintiff to settle his personal injury claim for much less than he would have done had he known the true extent of his injuries.

■ Also significantly, the tort of negligent misrepresentation frequently involves a defendant's statement that a contract exists, upon which plaintiff relies, only to later discover that the contract has been rejected or was never completed. Thus, negligent misrepresentation is a cause of action recognized in lieu of a breach of contract claim, not usually available where a contract was actually in force between the parties.

### DAMAGE EVIDENCE

In its first three points of error, Airborne argues that the damages proven by Lee Enterprises are strictly those recoverable for breach of contract, not those recoverable for fraud or negligent misrepresentation, and that therefore the affirmative jury finding on tort cannot be sustained because there were no damages proven under a tort theory. Airborne further argues that the evidence at trial did not in any way establish the amount of actual damage to Lee resulting from the statement made by Ms. Whitson, and for this reason also there is no evidence to sustain the damage verdict. We agree with both contentions.

■ There were three measures of damage available to plaintiff Lee for his fraud cause of action: The general damage measurements commonly called "out of pocket," "benefit of the bargain" and special damages. The Texas Supreme Court long ago established the traditional measure of damages for common law fraud: the difference between what the plaintiff parted with and what he received in reliance upon the fraudulent representations.

This is the "out-of-pocket" measure of damages. *Leyendecker & Associates, Inc. v. Wechter*, 683 S.W.2d 369, 373 (Tex.1984); *George v. Hesse*, 100 Tex. 44, 93 S.W. 107 (Tex.1906). In addition, Texas recognizes a second remedy for misrepresentation: "benefit of the bargain," which allows the plaintiff to recover the difference between value as represented and the actual value received. *Leyendecker*, 683 S.W.2d at 373; *Matthews v. AmWest Savings Associates*, 825 S.W.2d 552, 554 (Tex.App.—Beaumont 1992, writ denied).

■ Finally, the plaintiff is entitled to recover "special" or "consequential" damages shown to be the proximate result of the misrepresentation. *El Paso Development Company v. Ravel*, 339 S.W.2d 360, 367 (Tex.Civ.App.—El Paso 1960, writ ref'd n.r.e.); *Odom v. Meraz*, 810 S.W.2d 241, 245 (Tex.App.—El Paso 1991, writ dism'd, improvidently granted). Consequential damages, unlike general damages, are not presumed to be the necessary and usual result of the wrong. Plaintiff must therefore plead and prove them separately, and they must be premised upon a finding that they proximately resulted from the wrongful conduct of the defendant. *Ravel*, 339 S.W.2d at 367; *Odom*, 810 S.W.2d at 244.

■ For the tort of negligent misrepresentation, the measure of damages as outlined by the Restatement of Torts and adopted by the Texas Supreme Court is as follows:

(1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is legal cause, including:

(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

(b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

(2) the damages recoverable for a negligent misrepresentation *do not include the benefit of the plaintiff's contract*

*with the defendant. Federal Land Bank v. Sloane,* 825 S.W.2d at 442, citing Restatement (Second) of Torts § 552B (1977). [Emphasis added].

Initially, we note that the only element of consequential damage which plaintiff pled was its entering into loan agreements in reliance upon Whitson's representation. Lee Enterprises was therefore restricted to this single element of consequential damage by its own pleading. The law does not require specific pleading of general damages, so the "benefit of bargain" and "out-of-pocket" measures were available to it.

Plaintiff's testimony on damages came from two witnesses: C.R. Lee, Lee Enterprise's owner and president; and Stanley R. Smith, Lee Enterprise's C.P.A. Mr. Smith testified:

Q: Isn't it true that your opinion is going to be *based on the value of the contract?*

A: *That's correct, sir.*

Q: And its going to be based upon *the value of that contract being in full force and effect?*

A: *Continuously, yes sir.* [Emphasis added].

And:

Q: It [the valuation of damages] was a date certain what was the *value of that contract?* [sic]

A: *That's right.* [Emphasis added].

Mr. Lee, president and owner of Lee Enterprises, claimed his damages resulting from reliance upon Ms. Whitson's statement fell into four areas: (1) he acquired a building to house the business; (2) he purchased vans and a tractor-trailer rig; (3) he hired two employees; and (4) he borrowed $130,000 from First City Bank of Humble. He in no way tried to quantify the amount he paid for these items used to expand his business, versus the amount they were actually worth to him after his termination.

For example, what amount of interest did he pay on the loan from First City Bank? The record is silent. Was he obligated to pay unemployment benefits or retain the two employees he hired? The record indicates not, as they were terminable at will and Lee asserted his employees were mostly hired by rival delivery contractors, or Airborne itself, within days of Lee's termination. Was he forced to sell the building for significantly less than he paid for it; was he unable to rent it? Again, the record is silent. Was he unable to re-sell the vans, or was he forced to continue paying on a truck lease for which he no longer had use? Again, there is no indication of any amount for out-of-pocket loss.

Thus, actual damage evidence fails for several independent reasons. First, Mr. Smith's attempt to quantify general damages shows that Lee's damages were truly only for breach of contract, not for an independent tort at all. *DeLanney,* 809 S.W.2d at 495.[4] Second, the evidence nowhere quantifies any dollar amount proximately caused by Lee's reliance upon Ms. Whitson's statement. Third, the jury question on actual damages as submitted did not define the proper means by which general damages could be determined. Fourth, the consequential damages relied upon by Mr. Lee were not, except for the banks loans, supported by the pleadings. For these independent reasons, the award of actual damages in the amount of $250,000 is without legal or factual support in the record, and must be overturned. We sustain Points of Error One, Two and Three.

## EVIDENCE OF FRAUD AND MISREPRESENTATION

In Points of Error Four through Seven, Airborne urges that the evidence at trial was legally and factually insufficient to

4. We are aware of *Matthews v. AmWest Savings Association,* 825 S.W.2d 552, 554 (Tex.App.—Beaumont 1992, writ denied) a recent decision from the Beaumont Court of Appeals which attempts to distinguish fraud causes of actions from the *DeLanney* case and that of *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617 (Tex.1986). The theory employed there was that *DeLanney* and *Jim Walter Homes* both involved actions for negligence, not for fraud. Because fraud is a quasi-contractual action, the Beaumont Court reasoned, the law does not preclude recovery for traditional contract damages in a fraud case. We have reviewed *DeLanney* and *Jim Walter Homes,* and do not perceive such an intended distinction.

support the judgment for fraud, or to support the jury's finding of malice in support of punitive damages. We agree that there was no evidence to support a finding of common law fraud, and we likewise find there was no evidence to support a verdict for negligent misrepresentation as framed in the jury charge. We further find there was no evidence to support the jury's finding of malice, and that the award of punitive damages is therefore without support.

■ Specifically, on the issue of fraud, both C.R. Lee and Cindy Whitson agreed that the statement "as long as you do your job, you'll have a job" was true when Ms. Whitson made it. It is certainly arguable, although Airborne chose not to rely on the theory, that Lee Enterprises ceased to "do its job" at some point prior to its termination. Lee's employees were stealing freight and doing drugs on the job. C.R. Lee continued to subcontract with his drivers, rather than hire all drivers as employees, as required under the contract. There is evidence in the record that Whitson did promise Lee (and other delivery contractors) that so long as they did their jobs, they would continue to work for Airborne. There is *no* evidence, however, that Whitson had no intention of keeping that promise when it was made. Thus, there was no evidence to support the recovery for fraud.

■ The Cartage Agreement itself, moreover, specifically disclaimed any agreement had been made concerning the duration of employment. It specifically warned the contractor that the purchase of any equipment or the making of other commitments necessary to perform the contract were made at the contractor's peril. This written contract, signed by C.R. Lee's president, vitiated any reliance Lee might have placed in the sweeping, off-hand statements of Cindy Whitson as a matter of law. Particularly when coupled with the 30–day termination clause contained in the agreement, the disclaimers contained in the contract clearly gave notice that any conditional oral promise would not control.

Lee argues that the contract clauses cited above are themselves evidence that Airborne did not intend to perform its condi-

tional promise of continued employment at the time that promise was made. We do not agree. The written contract contained ample cautionary language which would preclude exclusive reliance by a reasonable businessperson on verbal statements contradicting the written agreement. (Assuming, that is, that the conditional promise did somehow contradict the written contract, an argument which this Court views with skepticism). *"Contractor agrees that no representations have been made ... about the duration of this Agreement...."* [Emphasis added]. *"This Agreement may be terminated by either party upon thirty (30) days' written notice...."* [Emphasis added]. Indeed, the trial court granted summary judgment holding that the termination was performed in accordance with the contract. Ms. Whitson's broad, subjective assertion simply did nothing to alter those written terms.

■ Likewise, there is no evidence that supports the jury's finding of malice. If there was no evidence to support the fraud finding, as a matter of law there can be no evidence to support a finding of actual malice or the award of punitive damages. *Schindler,* at 853.

■ We now reach Airborne's claim that the evidence on negligent misrepresentation was legally and factually insufficient to support the verdict. We find that the evidence on this cause of action cannot support the verdict either.

The elements of a cause of action for negligent misrepresentation are four-fold, as outlined above, and recognized by the Texas Supreme Court in *Sloane; See also Cook Consultants, Inc. v. Larson,* 677 S.W.2d 718 (Tex.App.—Dallas 1984), *aff'd in part and reversed and remanded in part,* 690 S.W.2d 567 (Tex.1985). For the same reasons that we find the fraud cause of action is unsupportable in the face of the clear, unambiguous terms of the written contract, we find that Lee could not have *justifiably* believed that Airborne would continue to employ the delivery service for an indeterminate time into the future,

based simply upon the subjective criteria that Lee was "doing its job." The terms of the written contract simply belie any reliance on Ms. Whitson's verbal assurance. We distinguish this case from those negligent misrepresentation cases regarding failure to complete contracts. Here, a binding written agreement was entered by the parties and controlled their actions. In *Sloane* and *Traylor,* in contrast, the cause of action was based upon the lack of a contract, even though defendants had assured plaintiffs there was, or would be, an agreement between them. This case is most clearly analogous to the Corpus Christi Court's opinion in *Portilla;* in both, a breach of contract is all that a breach of the pledge of continued employment upon satisfactory service can support.

▆ Further, and perhaps even more persuasively, we find that Whitson's statement was not "false information" as required for negligent misrepresentation recovery. It is certainly arguable that Lee *did* have a job so long as it did its job; it was terminated only after its performance became unsatisfactory. More importantly, this is simply not the sort of assertion which will support a misrepresentation verdict. To prevail in its claim of negligent misrepresentation, Lee needed to show that Airborne misrepresented an *existing fact,* not a promise of future conduct. *Sloane,* 825 S.W.2d at 442. Whitson's statement simply cannot be characterized as a misrepresentation of existing fact; if anything, it was a conditional promise of future employment. Here, a condition precedent (if you do your job) qualified any promise of Airborne's future conduct (we will retain you as delivery contractor). For these reasons, the tort of negligent misrepresentation was not proven in this case, as a matter of law.

▆ Finally, because the underlying causes of action for fraud and misrepresentation fail, the finding of malice in support of punitive damages, as well as the punitive damage award itself, of necessity fails also. *Schindler,* at 853.

We sustain Points of Error Four through Seven.

## CONCLUSION

Lee Enterprises was legally terminated by Airborne pursuant to the Cartage Agreement. Lee's damages all flowed from the termination of its contractual arrangement with Airborne; there were no independent damages supportable under fraud or negligent misrepresentation causes of action. Under *DeLanney,* therefore, there can be no recovery for tort.

Lee failed to prove that Whitson's statement was false when made, precluding recovery for fraud. Lee could show neither justifiable reliance on Whitson's statement, nor misrepresentation of an existing fact, both necessary for negligent misrepresentation recovery. Absent an award of actual damages or evidence of fraud, the punitive damage award cannot stand.

In sum, this was a breach of contract case. Plaintiff lost its breach of contract claims. We are compelled to reverse and render the trial court's judgment for recovery in tort.