Mills v. Marquette 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-94-100-CV

        CYNTHIA MILLS & DON NICHOLSON, 
        INDIVIDUALLY AND D/B/A INDEPENDENT
        FINANCIAL GROUP,
                                                                                                        Appellants
        v.

        MARQUETTE NATIONAL LIFE INSURANCE
        COMPANY, ET AL.,
                                                                                                        Appellees
 

From the 192nd District Court
Dallas County, Texas
Trial Court # 92-06415-K
                                                                                                    

O P I N I O N
                                                                                                    

          This is an appeal by Cynthia Mills and Don Nicholson, individually and doing business as
Independent Financial Group (IFG), of an order granting summary judgment in favor of appellees
Marquette National Life Insurance Company and Ron Cline, on several causes of action: breach
of contract by Marquette; the awarding of attorney's fees and out-of-pocket costs to Marquette on
the breach of contract claim; fraud by Marquette; fraud by Cline; misappropriation of assets by
Cline; a violation of article 21.21 of the Insurance Code by Marquette; and a violation of article
21.21 of the Insurance Code by Cline. We reverse and remand on the breach of contract claim,
the claims for attorneys fees, and the claim for out-of-pocket costs. We affirm in all other
respects.
I. Factual Background
          Prior to August 1990, Cline was in the business of, among other things, recruiting agents
to sell insurance policies for International Security Life Insurance Company (ISL). In August
1990 Mills and Nicholson (hereafter referred to either individually or collectively as IFG) met with
Cline to discuss the possibility of selling ISL policies. The meeting was successful and IFG agreed
to sell ISL policies.
          A short time later ISL, due to rapid expansion, discovered that it would need the assistance
of another insurance company to market its policies nationwide. In early 1991, Marquette began
to issue insurance policies in cooperation with ISL that were similar to the policies ISL had been
issuing. Cline, in partnership with a man named Ron Davidson, negotiated an agreement between
IFG and Marquette whereby IFG would sell Marquette policies (hereafter the Marquette
Agreement).
          Meanwhile, Marquette had decided that it would enlist the assistance of a third party,
Desert Sun, to administer its insurance policies and its contracts with agents. On the same date
that IFG entered into the Marquette Agreement, April 1, 1991, IFG signed an agreement with
Desert Sun whereby Desert Sun could, among other things, advance funds to IFG at its sole
discretion (hereafter the Desert Sun Agreement). Several months later, Marquette decided to use
a different third-party-administrator, Philadelphia American Life Insurance Company (PALICO),
and the Desert Sun Agreement was assigned to Marquette.
          By the end of 1991, IFG's relationships with Marquette and PALICO began to deteriorate
rapidly. Marquette suspected IFG of rewriting Marquette insureds with other insurance carriers
in order to reap the benefit of higher commissions with these carriers, a practice prohibited by the
Marquette Agreement. IFG accused PALICO of negligently administering the Marquette policies
and distributing commission payments to IFG. Finally, in February 1992, the final straw that
broke the camel's back occurred when Marquette debited approximately $45,000 from IFG's
account, apparently to recoup monies Marquette believed had been previously advanced to it. IFG
objected to the charges and filed suit against Marquette and Cline, claiming approximately
$360,000 in damages as a result of fraud, breach of contract, and misappropriation of funds. 
Cline and Marquette filed general denials and later both moved for summary judgment on all
grounds. Marquette, in addition, through a counterclaim, filed a suit for declaratory judgment and
an audit of the IFG accounts, asking the court to declare that Marquette owed IFG only
$17,362.03 in delinquent commissions. The trial court granted all motions for summary judgment
as well as Marquette's motion for declaratory judgment. This appeal followed.
II. Whether Marquette's Summary Judgment Motion Was Defective
          As a preliminary matter, IFG asserts Marquette's motion for summary judgment was
insufficient because if failed to assert any particular grounds upon which relief could be granted. 
Specifically, IFG believes Marquette's attempt to incorporate into its own motion the arguments
made by co-defendant Cline was ineffective. IFG's points in this regard, however, are without
merit because both Marquette's and Cline's motions for summary judgment were sufficient to
stand on their own without any reference to the other's motion. See Tex. R. Civ. P. 166a(c).
III. Whether Summary Judgment on the Fraud Claims was Error
          We will now examine IFG's arguments that the trial court erred in granting summary
judgment in favor of Marquette and Cline on IFG's several causes of action. The standards for
reviewing a motion for summary judgment are well-established. They are:
(1) The movant for summary judgment has the burden of showing that there is no
genuine issue of material fact and that the movant is entitled to judgment as a
matter of law.
 
(2) In deciding whether there is a disputed material fact issue precluding summary
judgment, evidence favorable to the non-movant will be taken as true.
 
(3) Every reasonable inference must be indulged in favor of the non-movant and
any doubts resolved in his favor.

Nixon v. Mr. Property Management, 690 S.W.2d 546, 548-49 (Tex. 1985). Summary judgment
is proper for a defendant if its summary judgment proof establishes, as a matter of law, that no
genuine issue of material fact exists concerning one or more of the essential elements of the
plaintiff's cause of action. Goldberg v. United States Shoe Corp., 775 S.W.2d 751, 752 (Tex.
App.—Houston [1st Dist.] 1989, writ denied). A movant may also prevail if it demonstrates that
the law does not recognize the plaintiff's cause of action. Spring Garden 79U, Inc. v. Stewart
Title Co., 874 S.W.2d 945, 947 (Tex. App.—Houston [1st Dist.] 1994, no writ h.). Summary
judgment is also proper if a defendant conclusively establishes all the elements of its affirmative
defenses as a matter of law. Munoz v. Gulf Oil Co., 693 S.W.2d 372, 373 (Tex. 1984). A matter
is conclusively established if ordinary minds cannot differ as to the conclusion to be drawn from
the evidence. Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc., 644 S.W.2d 443,
446 (Tex. 1982). With these principles in mind, we look to the summary-judgment evidence. 
          IFG asserts the trial court erred in granting Marquette a summary judgment on IFG's
claims of fraud because the summary judgment evidence failed to conclusively disprove any of the
elements of its cause of action. Several recent cases have examined this situation where a plaintiff
attempts to stretch a contract dispute into a tort suit, apparently with the intention of garnering
punitive damages on top of their actual damages. The several appellate courts that have addressed
this issue have determined that a party's cause of action sounds only in contract, not tort, where
the party's damages are the result of an allegedly breached contract and he is seeking to recover
what he would have gained had the promise been performed. Southwestern Bell Tel. Co. v.
DeLanney, 809 S.W.2d 493, 495 (Tex. 1991); Jim Walter Homes, Inc. v. Reed, 711 S.W.2d 617,
618 (Tex. 1986); see also Collins v. Allied Pharmacy Management, Inc., 871 S.W.2d 929, 936
(Tex. App.—Houston [14th Dist.] 1994, no writ h.). We agree with the reasoning of these courts.
          The crux of IFG's complaint is that Marquette failed to pay them what they were owed
under the Marquette Agreement. IFG wants what they believe to be due to them under the
contract. Because the damages they seek are the actual damages under the contract, their cause
of action sounds only in contract, not tort.



          IFG relies upon a recent opinion from the Beaumont Court of Appeals in support of its
argument that the holdings of DeLanney and Reed are not applicable in cases where the tort alleged
is one of fraud. See Matthews v. AmWest Savings Assoc., 825 S.W.2d 552, 554 (Tex.
App.—Beaumont 1992, writ denied). The El Paso Court of Appeals has disagreed with the
holding in Matthews, finding that the DeLanney or the Reed courts did not intend any such
distinction. See Airborne Freight v. C.R. Lee Enter., 847 S.W.2d 289, 296 n.4 (Tex. App.—El
Paso 1992, writ denied). We, similarly, find no basis for establishing such a distinction.
IV. Whether Summary Judgment on the Breach of Contract Claim Was Error

          The whole of IFG's complaints that Marquette breached its agreements with IFG emanates
from the assumption that IFG was to be paid by Marquette on an "earned" as opposed to an
"advance" basis. The summary judgment evidence indicates that an insurance agent is paid on an
earned basis when he receives his commission from the insurer, only after the insurer has been
paid the premiums owed to it by the insured who purchased his policy from the agent in question. 
Under an advance system of payment, however, an agent will be paid before any premium
payments have been received by the insurer, thus creating the possibility that the agent could
receive commissions which he is not entitled to keep and must, therefore, eventually return to the
insurer.
          IFG maintains that a number of oral agreements were made between IFG and Cline, who
was acting on behalf of Marquette, establishing a method of payment through which IFG would
be paid exclusively on an earned basis. These agreements were not included in either of the
agency contracts at issue; nevertheless, IFG contends that they are binding, notwithstanding a
merger clause in the general agreement, because they do not alter the written provisions of either
contract.


 See Leon Ltd. v. Albuquerque Commons Partnership, 862 S.W.2d 693, 700 (Tex.
App.—El Paso 1993, no writ) ("The parol evidence rule does not preclude enforcement of a prior
or contemporaneous agreement if it is collateral to and not inconsistent with the final agreement,
as long as it does not vary or contradict the terms of the final agreement.").
          Marquette responds with the assertion that the merger clause effectively precludes the
enforceability of any parol agreements to either of the two agreements. Marquette argues that the
meaning of the terms of the written agreements is clear and unambiguous, thereby rendering any
reference to parol terms unlawful. See Albuquerque Commons, 862 S.W.2d at 700. Furthermore,
Marquette argues that the method of figuring the commissions to be paid to IFG is clearly stated
in the agreements and, therefore, the trial court could correctly determine that IFG was owed only
$17,362.03 in delinquent commissions. See Coker v. Coker, 650 S.W.2d 391, 393-94 (Tex.
1983).



          The only provisions of the Marquette Agreement referring to the method by which IFG was
to be paid its commissions read as follows:
Commissions. [IFG] shall earn commissions for [Marquette] coverage at the rates set forth
on Exhibit 1 hereto, less related commissions paid to sub-agents recruited and
recommended to [Marquette] by [IFG]. Commissions previously paid to [IFG] shall be
returned to [Marquette] on an unearned basis for all cancelled business, reductions of
premiums, and premiums returned.
...
 
Offset. Any indebtedness to [Marquette] of [IFG] or a sub-agent recruited and
recommended by [IFG] pursuant to this Agreement may be offset against any commissions
due hereunder to [IFG].

Exhibit one then indicated that Marquette would pay IFG according to several listed rates on
"premiums collected for in-force business." Stated as simply as possible, exhibit one provided that
IFG was to receive 100% of the insured's first month's commissionable premium


; 45% of the
commissionable premium for months 2-12; and 10% thereafter. An added feature to the contract
provided that IFG would receive not less than 50% of the commissionable premium at the end of
the twelfth month of a policy's existence (hereafter "the 50% per annum provision"). A
production bonus provision was handwritten onto exhibit one, providing that the pay rate of 45%
for months 2-12 would be increased to 50%, and the guaranteed twelve-month rate of 50% would
be increased to 55%, if IFG managed to sell $500,000 worth of policies.


 Another handwritten
addendum provided that IFG would be vested to receive 10% of an insured's renewal premiums
if the insured paid twelve months of premiums and IFG had not violated the terms of its agency
contract within those twelve months.
          The Desert Sun Agreement provided, in part:
 
Advances. Desert Sun, at its sole discretion as to time and amount, shall make
advances to [IFG] based upon [its] production of [Marquette] business.
 
Repayment by [Marquette]. Commission statements detailing [IFG's] earned
commissions on [Marquette] business, including earned commissions for other
general agents and agents recruited and supervised by [IFG], will be delivered to
[IFG] on or about the tenth (10th) day of each month for the previous month's
production. Upon receipt of such commission statement, [IFG] shall repay to
Desert Sun, or its designee, an amount equal to the lesser of ... total commissions
earned for the reported month or ... total amounts advanced to [IFG] hereunder. 
[IFG] hereby assigns to Desert Sun, or its designee, all [its] rights to receive
commissions under such General Agent's Agreement, in an amount equal to
outstanding advances hereunder.

          These provisions apparently are the source of the parties' disagreement on the method of
calculating IFG's pay. The summary judgment evidence indicates that IFG believed it was being
paid by Marquette on an earned basis until February 24, 1992. The commission statement
generated by Marquette for February 8, 1992, revealed year-to-date earnings by IFG in the amount
of $57,414.12. The February 24 statement indicated the year-to-date earnings were $12,839.95. 
The dramatic drop in year-to-date earnings, asserts IFG, was the result of Marquette deciding that
it had been paying advances to IFG instead of earned commissions. At about the time this
February 24 statement was generated, Marquette stopped paying any commissions to IFG. IFG
contends it lost approximately $306,000 as a result of this alleged breach.
          While IFG maintains that it was paid on an earned basis, the summary judgment evidence
is uncontroverted that IFG did receive advance payments from Marquette on newly submitted
applications. When a putative insured submitted his application for a policy, he would include the
first month's premium with his application. Under the Marquette Agreement, IFG was entitled
to 100% of the commissionable premium derived from this initial payment. This payment
received by IFG, however, was subject to being reclaimed by Marquette in the event either that
Marquette determined that the putative insured was ineligible, under its own rules for qualification
for a policy, or the insured, as he has a legal right to do, decides not to accept the policy within
approximately 30 days of the application. An application cancelled by Marquette was referred to
as a "declined" and an application cancelled by the applicant was referred to as a "not-taken". 
          Mills and Nicholson both provided sworn testimony that Marquette would pay IFG the
commissionable premium generated from these applications and then later debit IFG's account for
the value of these commissionable premiums if the application was not-taken or declined. They
believed Marquette was handling these accounts on a continual basis to keep up with these
charges. See Transcript 629, 2144.
          The problem, according to Marquette, appears to evolve from situations where the insured
cancels his policy sometime after the first month. See Appellee's Brief at 15. When an
application would be cancelled within the first month as either a not-taken or a declined, IFG
would be charged back the commissionable premium that was issued to it when the application was
submitted. This procedure caused no problems for either Marquette or IFG. The charge-backs
that did cause serious problems occurred when an application was cancelled sometime after the
first month. Under that situation, IFG would have already received 100% of the first month's
commissionable premium, plus either 45 or 50% of the commissionable premium generated from
each subsequent month's premium payments. Apparently, IFG believed that, under that scenario,
no charge-backs should have been made at all because it was entitled to keep all the
commissionable premiums paid to it up to the date of cancellation. Marquette, on the other hand,
construed the 50% per annum provision mentioned above as meaning that IFG would never be
entitled to keep more than 50% of the commissionable premium generated from any insured for
any reason.


 As a pure matter of mathematics, under the system of payment reflected in the
Marquette Agreement, IFG would have been paid more than 50% of the commissionable premium
if a policy was cancelled, for whatever reason, during the second through the eleventh months of
the policy. The summary judgment evidence, along with the pleadings, seems to indicate that
Marquette in the February 24, 1992, statement decided to charge IFG for all amounts previously
paid to IFG by Marquette that exceeded the 50% mark for each insured.
          There appears to be no controversy between the parties concerning Marquette's ability to
recoup from IFG the first month's commissionable premium when the putative insured's
application, during that first month, was either rejected by Marquette or rescinded by the
applicant. Therefore, any attempt to label IFG's payment method as either "earned" or
"advanced" during this first month is inconsequential. The real question is whether Marquette was
able, according to the agreements, to recoup any commissionable premiums paid to IFG for an
insured who had his policy cancelled, for whatever reason, during the second through eleventh
months. A proper construction of the 50% per annum provision is required before a determination
can be made as to whether Marquette breached its contract with IFG. Because this ground was
not argued to the trial court, it cannot be considered on appeal. See Tex. R. Civ. P. 166a(c). We
will reverse and remand on this point of error.
V. Whether Summary Judgment on the Misappropriation of Assets Claims Was
Error

          IFG argues the trial court erred in granting Cline summary judgment on its claims of
misappropriation of funds, money had and received, and assumpsit. The evidence establishes that
any funds taken from IFG by either Cline or Marquette was done pursuant to the agreements. 
Accordingly, IFG's only argument is for breach of contract. Therefore, the trial court did not err
in granting summary judgment on these extraneous issues.
VI. Whether the Awarding of Attorney's Fees and Out-of-Pocket Costs Was Error

          IFG argues that the trial court erred in ordering it to pay attorney's fees and out-of-pocket
costs to Marquette for enforcing its rights under the contract. However, as we are remanding the
cause to the trial court for another construction of the contracts, we conclude the trial court's order
of attorney's fees should be reversed.
          IFG also argues that the awarding of attorney's fees for Cline was error. We agree. The
trial court granted Cline attorney's fees for declaring that Cline could not be contractually liable
to IFG. IFG, however, never sued Cline for breach of contract; IFG only sued Cline in tort. The
awarding of attorney's fees was based upon this declaratory judgment ruling. As declaratory
judgment is not an appropriate vehicle for determining tort liability, the trial court erred. See The
Housing Auth. of the City of Harlingen v. Valdez, 841 S.W.2d 860, 865 (Tex. App.—Corpus
Christi 1992, writ denied); K.M.S. Research Lab., Inc. v. Willingham, 629 S.W.2d 173, 174
(Tex. App.—Dallas 1982, no writ).
VII. Whether Summary Judgment on the Insurance Code Claims Was Error

          IFG contends the trial court erred in granting summary judgment in favor of Marquette and
Cline on IFG's insurance code claim. Section 16(a) of article 21.21 of the Insurance Code
provides:
Any person who has sustained actual damages as a result of another's engaging in
an act or practice declared in Section 4 of this Article or in rules or regulations
lawfully adopted by the [state insurance] Board under this Article to be unfair
methods of competition or unfair or deceptive acts or practices in the business of
insurance or in any practice defined by Section 17.46 of the Business & Commerce
Code, as amended, as an unlawful deceptive trade practice may maintain an action
against the person or persons engaging in such acts or practices.

Tex. Ins. Code Ann. art. 21.21, § 16(a) (Vernon Supp. 1995).
          IFG's argument must fail because article 21.21 provides a cause of action only in the
context of an insured-insurer relationship. See Allstate Ins. Co. v. Watson, 876 S.W.2d 145, 149
(Tex. 1994) (on rehearing). The Supreme Court in Watson, although dealing specifically with the
question of whether a third party beneficiary to an insurance contract could sue an insurer under
article 21.21 for unfair claim settlement practices, noted that the impetus for the enactment of
article 21.21 derived from the special relationship between an insured and an insurer. The court
wrote:
The obligations imposed by art. 21.21 of the Insurance Code and Vail [v. Texas
Farm Bureau Mutual Ins. Co., 754 S.W.2d 129 (Tex. 1988) (a case construing
article 21.21) are engrafted onto the contract between the insurer and insured and
are extra-contractual in nature. A third party claimant has no contract with the
insurer or the insured, has not paid any premiums, has on legal relationship to the
insurer or special relationship of trust with the insurer, and in short, has no basis
upon which to expect or demand the benefit of the extra-contractual obligations
imposed on insurers under art. 21.21 with regard to their insureds. Nothing in Vail
suggests that the extra-contractual obligations, rights, and remedies of art. 21.21,
section 16 extend to third party claimants.

Watson, 876 S.W.2d at 149.
          In the instant case, obviously, the plaintiff is not a third party claimant or beneficiary to
contract between an insured and an insurer. It is true that the source of the conflict in this case
is a direct contract between an insurer and another party. But the fact that this other party is not
an insured demands the conclusion that article 21.21 provides no cause of action to this other
party. When the Watson court discussed article 21.21 imposing extra-contractual obligations upon
an insured, it did so because it recognized the special legal relationship between an insurer and the
insured. See id. The insurer is required to stand as the insured's champion should he incur any
financial liability as the result of committing a certain type of conduct covered in his insurance
policy. See id. at 150. It is the nature of this relationship that prompted the legislature to provide
insureds a statutory cause of action against the insurer when it acts deceptively toward the insured. 
See id. at 147; see also Transport Ins. Co. v. Faircloth, 38 Tex. Sup. Ct. J. 424, 426 (March 30,
1995). This special relationship of trust between an insured and an insurer simply does not exist
in the setting of an agent selling policies for an insurer. Accordingly, we conclude that article
21.21 provides IFG no cause of action against either Marquette or Cline.
          We reverse and remand the summary judgment rendered on IFG's breach of contract claim
against Marquette and the awarding of attorney's fees and out-of-pocket costs to Marquette on the
breach of contract claim. We affirm the trial courts summary judgment in favor of Marquette and
Cline on the fraud claims and the article 21.21 claims. We also affirm the trial court's summary
judgment in favor of Cline on the misappropriation of assets claims. 
 
                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Affirmed in part, reversed and remanded in part
Opinion delivered and filed May 31, 1995
Do not publish