# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00562-CV

**Agillion, Inc., Appellant**

**v.**

**Mary Oliver, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
## NO. GN1-00571, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING

## O P I N I O N

Mary Oliver sued Agillion, Inc. and Steve Papermaster, the former CEO of Agillion, for breach of contract, fraud, and negligent misrepresentation involving the circumstances surrounding her decision to leave American Express to work for Agillion. Oliver dismissed her fraud claim as well as all claims against Papermaster. Oliver filed a motion for partial summary judgment on her breach of contract claim, which the trial court granted. The case proceeded to trial on the sole claim of negligent misrepresentation. The jury awarded Oliver $589,200 in actual damages and $883,800 in punitive damages.

On appeal, Agillion argues that the trial court erred in: (1) submitting the negligent misrepresentation claim to the jury and rendering judgment on the findings of the jury because Oliver's claim is a contract claim not a tort claim and (2) submitting a punitive damages charge to

the jury and rendering judgment on the finding of punitive damages made by the jury. Agillion also argues that: (3) the evidence is legally and factually insufficient to support the finding of negligent misrepresentation made by the jury and (4) the evidence is legally and factually insufficient to support the finding of malice made by the jury.

Because we conclude that Oliver's only claim sounds in contract and not in tort, we hold that the trial court erred in submitting the negligent misrepresentation claim to the jury and rendering judgment on the verdict. We also hold that the trial court erred in submitting a punitive damages charge to the jury and rendering judgment on the finding of punitive damages because a breach of contract will not support punitive damages. We will reverse the judgment of the trial court and remand for entry of a judgment pursuant to the order granting partial summary judgment on the breach of contract.

**FACTUAL BACKGROUND**

Mary Oliver was an executive at American Express in New York in the fall of 1999 when she was contacted by a headhunter about a position at Agillion, Inc., a company located in Austin, Texas. In her negotiations with Papermaster, the chief executive officer ("CEO") of Agillion, Oliver indicated that she would not leave her present employer unless Agillion agreed to cover the value of her compensation agreement with American Express, specifically, stock options that would not vest until March 2001. Oliver claims that Papermaster agreed to cover her American Express Compensation but admits that she expected there would be negotiations over how much would be paid, how it would be paid, and when it would be paid. Because Papermaster needed

2

Oliver to start to work immediately on a Super Bowl ad campaign, she claims he agreed that he would "make her whole," even though the specifics could not be finalized until a later date.

In December 1999, Agillion sent Oliver an offer letter laying out some of the terms of the agreement including stock options, salary, start date, bonuses, and which party was responsible for relocation expenses.[1] This offer letter also stated that a more formal employment agreement would be prepared later that would incorporate the terms in the offer letter and other issues, including a severance agreement. Oliver made substantial alterations to the offer letter including adding a provision that there needed to be a clarification on the severance and termination terms. The offer letter contained no specific provision guaranteeing Oliver the equivalent of her American Express compensation package.[2] There was no action on the part of Agillion in response to Oliver's changes.

Oliver started working for Agillion in January 2000, before a formal employment agreement had been prepared and before there was an agreement specifying what her severance package would be or addressing the amount necessary to match her American Express package, which Oliver claims Papermaster agreed to guarantee her. Concerning this guarantee, Oliver said that it is not that uncommon for high level executives to begin working for a new company before working out all the details of an employment agreement.

---

[1] This letter was the second offer letter sent by Agillion to Oliver because Oliver had rejected the first offer letter.

[2] While Oliver is adamant that Papermaster agreed to guarantee her American Express compensation, she admits that they never agreed to any specific terms. It would have been impossible to reach an agreement on how much would be paid because she would not know how much the American Express stock options were worth until over a year later.

The ultimate value of the compensation package Oliver had with American Express could not be known until 2001, when her package would have vested. In addition, part of the compensation she had with American Express consisted of portfolio grants whose values were based on an algorithm that Oliver admitted made it difficult to estimate how much the grants would be worth in 2001. Oliver admitted that she had to make a few assumptions on the share price to come up with an estimate of how much her American Express agreement would have been worth in 2001.[3]

In January 2000, Papermaster went to California because his father was dying of cancer. When Papermaster was leaving, he told Oliver he would start a draft of the employment agreement. Oliver admitted that she did not push Papermaster to finalize the employment agreement because she felt it would have been inappropriate to discuss the matter given the situation with Papermaster's father.

As of June 2000, there was still no formal employment agreement between Agillion and Oliver. In frustration, Oliver drafted her own version of an employment agreement, which called for Agillion to pay her $1.5 million as severance.[4] Oliver gave the draft to Papermaster, intending it to be a starting point to negotiate a final agreement. Because Papermaster was going out of town, he asked Oliver to work with Dave Henkel, another Agillion executive hired around the same time as Oliver, in preparing a formal employment agreement. Henkel prepared a draft, but the employment agreement he prepared contained no reference to a $1.5 million severance agreement

[3] Oliver initially stated that she thought that if she stayed at American Express until March of 2001 it would be like having a "check for $2 million."

[4] Oliver said that the draft provided for $1.5 million and not $2 million because she had recouped approximately $500,000 when she left American Express by selling the portion of her stock that had already vested.

or any guarantee to cover Oliver's American Express compensation package. Henkel told Oliver he was unaware of any agreement to make Oliver whole with respect to her American Express compensation package.

Oliver found the employment agreement prepared by Henkel completely unacceptable. Almost immediately after reviewing the agreement, and before allowing Agillion or Papermaster to correct any misunderstandings, Oliver tendered her resignation. At the time she resigned, she continued negotiating specific terms of a severance agreement. After she was unable to reach an agreement with Henkel, Oliver again met with Papermaster and they negotiated an agreement that she would receive approximately $1 million in two installments. The formal severance agreement, signed by all parties, provided that Agillion would pay Oliver $407,633 on July 31, 2000, and $589,200 on January 31, 2001.

Agillion made the first payment of $407,633, but was unable to make the second payment of $589,200 because by January 2001 the company had become insolvent. Oliver made a demand for payment but Agillion failed to pay. Oliver then sued Agillion for breach of contract, fraud, and negligent misrepresentation, obtaining partial summary judgment on her breach of contract claim for $589,200. After she dropped her fraud claim, the case proceeded to trial on her negligent misrepresentation claim and the jury awarded $589,200 in reliance damages. It also found malice and awarded $883,800 in punitive damages. Because the breach of contract and negligent misrepresentation claims were pled in the alternative, Oliver elected her remedy and moved for entry of judgment on her negligent misrepresentation claim.

**DISCUSSION**

*Negligent Misrepresentation*

Agillion argues that the trial court erred in submitting the claim of negligent misrepresentation to the jury and rendering judgment on the jury's finding of negligent misrepresentation because Oliver's only claim is in contract. In order to determine whether a claim falls under tort or contract law, the substance of the claim must be examined. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617-18 (Tex. 1986) (citing *International Printing Pressmen and Ass't Union v. Smith*, 198 S.W.2d 729 (Tex. 1946)). If the injury is only the economic loss from a contract itself, the action should be a breach of contract claim. *Id.* at 618.

The Texas Supreme Court has required an independent injury other than a breach of contract in order for there to be a valid negligent misrepresentation claim. *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.,* 973 S.W.2d 662, 663 (Tex. 1998) (reinforcing the independent injury requirement of section 552B of the *Restatement (Second) of Torts*). A common scenario for negligent misrepresentation occurs when a defendant states that a contract exists and the plaintiff relies on the statement, but it is later discovered that the contract was rejected or never completed. *Abbott v. Pollock,* 946 S.W.2d 513, 518 (Tex. App.—Austin 1997, writ denied). A claim for negligent misrepresentation is recognized in the place of a breach of contract claim and is not usually available when a contract was in force between the parties. *Id.*

When Oliver came to work for Agillion, she did so on the basis of an offer letter. Both parties recognized that a more formal employment agreement, to be prepared in the future, would be needed to clarify the termination and severance provisions. When Oliver ultimately

6

resigned from the company, she entered into a severance agreement with Agillion that afforded her $1 million.[5]

This is not a situation where Oliver relied on Agillion's statement that a contract existed only to later find out that the contract had never been completed. *Cf. Abbott*, 946 S.W.2d at 518). The basis of Oliver's claim is that Agillion and Oliver entered into an agreement that if Oliver came to work for Agillion right away (January 2000), Agillion would make her whole with regards to her American Express package. Both parties apparently agreed that the amount guaranteed to Oliver would be negotiated in a formal employment agreement at a later date, primarily because Oliver was not able to articulate specific details regarding the worth of her stock options at that time.

Before a formal employment agreement was completed, Oliver tendered her resignation. Nevertheless, Oliver and Agillion signed a severance agreement providing Oliver with an amount she was apparently satisfied represented the worth of her American Express stock as there is no evidence to the contrary.[6] When Oliver accepted employment at Agillion she knew that certain terms of her compensation package were to be spelled out in a later agreement. No specific terms were discussed because it was impossible to know the value of her American Express compensation package at that time. According to Oliver, "[the calculation of the amount] wasn't simple . . ." "I

_____

[5] Although the dispute between Oliver and Agillion encompasses more than one agreement, the history of dealings between these parties points to a single objective—compensating Oliver for the value of the American Express compensation she surrendered by starting to work with Agillion before that compensation had vested.

[6] Because they were unable to work out a formal employment agreement before Oliver resigned, Agillion's agreement to cover the amount of the American Express compensation was honored in a severance, rather than employment, agreement.

never told them . . . I knew exactly what it was. I expected that we would negotiate the assumptions [that my approximations were based on]."

When Oliver began negotiating her formal employment contract in June 2000, Papermaster was out of town and asked her to work with Henkel. Unfortunately, Henkel was unaware of her discussions with Papermaster and drafted an agreement that did not address guaranteeing her American Express compensation.[7] Oliver resigned within 24 hours of being presented with the initial employment agreement that failed to compensate her in an amount equivalent to her American Express package. She did not discuss with Papermaster why Henkel was unaware of Papermaster's "make whole" guarantee.

During her employment, Oliver received her salary, stock options, and relocation expenses, all as set forth in the offer letter. When Papermaster accepted her resignation, they immediately began to discuss the severance agreement. Oliver told him she was going to "hold him to his promise that Agillion was going to guarantee my American Express compensation package." He agreed and instructed Henkel to come up with an offer to cover Oliver's American Express compensation. When Henkel's offer was unacceptable to Oliver, she went back to Papermaster that same day. Oliver testified that Papermaster apologized and made her an offer of $1 million in cash as severance. The severance agreement was entered into mutually and was meant to cover the loss

_____

[7] It is worth noting that Henkel was hired shortly after Oliver and during the time that Papermaster was tending to his dying father. It is not surprising that Henkel was not made aware of Oliver's discussions with Papermaster regarding her compensation in light of the surrounding circumstances.

8

of Oliver's American Express compensation package.[8] There is no evidence that Oliver received less in the severance agreement than a fair equivalent to her surrendered American Express compensation package. In fact, when asked what she was "left losing," Oliver testified that "it's approximately $500,000. It's a little more, but it's approximately [$500,000]." In other words, had Agillion not breached the severance agreement, Oliver would have received all that she apparently hoped to receive.[9]

Throughout the dealings between Oliver and Agillion, the objective had always been the fulfillment of Oliver's demand that she be compensated for her lost American Express package. This started with an offer letter, several terms of which were to be negotiated at a later date, and culminated in a severance contract. There was no evidence this contract was anything other than an arms length transaction satisfactory to both sides. Because Oliver agreed to the severance agreement, the damages she complains of are unquestionably premised upon Agillion's failure to perform under the written severance agreement. In other words, her claim sounds in contract.

The supreme court has observed that it is the nature of the injury which is most helpful in determining whether the duty that has been breached sounds in contract of tort. *Airborne Freight Corp., Inc., v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 293 (Tex. App.—El Paso 1992, writ denied). When the injury is only an economic loss pursuant to the terms of a contract, the action

---

[8] Oliver testified that when Papermaster made the offer, she had referred to his promise to guarantee her American Express compensation and "that's what he was doing."

[9] Oliver had worked for Agillion for approximately six months and received a severance package of $1 million, an unusually high amount not typical to executives in most companies, according to both Papermaster and Henkel.

sounds in contract.[10]  *Id.*; *Southwestern Bell Tele. Co. v. Delanney*, 809 S.W.2d 493, 495 (Tex. 1991); *Jim Walter Homes*, 711 S.W.2d at 618.  The substance of the severance contract encompassed all claims Oliver had against Agillion arising from this employment relationship.  Specifically, it states that "[t]his Agreement . . . constitute[s] an integrated, written contract, expressing the entire agreement between the Company and you with respect to the subject matter hereof.  In this regard, you represent and warrant that you are not relying on any promises or representations that do not appear in this Agreement."  Had this contract not been breached, there would be no dispute.  The injury Oliver complains of arises out of a specific agreement between the parties.  Because there was no injury independent from Agillion's breach of contract, Oliver's claim is a contract claim and the trial court erred in submitting the claim of negligent misrepresentation to the jury.  We sustain Agillion's first issue.

In its ninth issue, Agillion claims that the evidence is legally insufficient to support the jury's finding of malice and award of punitive damages.  Because we have held that Oliver's claim sounds in contract and not tort, an award of exemplary damages cannot stand because they are not allowed for breach of contract.  Even a malicious breach would not be grounds for awarding exemplary damages, absent a distinct tort that has been alleged and proved.  *Amoco Prod. Co. v.*

---

[10]  The actual damages the jury awarded Oliver for her misrepresentation claim were $589,200, which is the exact amount of money Agillion was unable to provide Oliver under the severance contract.  In a similar case, the supreme court decided that a claim more appropriately sounded in contract than in negligent misrepresentation, noting that the damages awarded by the jury for the misrepresentation claim were identical to the damages the jury awarded for the breach of contract claim.  *D.S.A.*, *Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663 (Tex. 1998).

*Alexander*, 622 S.W.2d 563, 571 (Tex. 1981).  Therefore, we sustain Agillion's ninth issue and reverse the award of $883,800 in punitive damages.

## CONCLUSION

We conclude that Oliver's only cause of action is a contract claim and the trial court erred in submitting the claim of negligent misrepresentation to the jury.  We reverse the judgment of the trial court entered on the jury's verdict and remand for entry of a judgment pursuant to the order granting partial summary judgment on the breach of contract.

_____

David Puryear, Justice

Before Chief Justice Law, Justices B. A. Smith and David Puryear

Reversed and Remanded

Filed:   July 11, 2003