COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO. 2-02-264-CV

 

 

PLEASANT GLADE
ASSEMBLY OF GOD,                               APPELLANTS

REVEREND LLOYD A. MCCUTCHEN, 

ROD LINZAY, HOLLY LINZAY, SANDRA 

SMITH, BECKY BICKEL, AND PAUL PATTERSON

 

                                                   V.

 

LAURA SCHUBERT                                                                 APPELLEE

 

                                              ------------

 

           FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                OPINION ON REHEARING

 

                                              ------------

Introduction








This is an appeal
from a judgment against Pleasant Glade Assembly of God church, two of its
pastors, and several church members[1]
based on a jury verdict in favor of a former church member, Laura Schubert, for
assault and battery and false imprisonment. 
In ten issues, appellants assert they should not be held liable for
Laura=s damages because they were acting in loco parentis
and as Good Samaritans.  They also
complain that the damages awarded by the jury were not foreseeable and that the
trial court improperly admitted medical evidence concerning Laura=s post-traumatic stress disorder (PTSD).  Finally, appellants contend that the
judgment should be reversed because there is no clear and convincing evidence,
as required by the First Amendment, that they acted with malice.

We reverse and
render in part and affirm in part.

                             Factual and
Procedural Background

On Saturday, June
8, 1996, Tom and Judy Schubert went out of town for a long weekend, leaving
their three teenage children home alone. 
The Schuberts left their oldest child, nineteen-year-old Amy, in
charge.  While the Schuberts were away,
their middle child, seventeen-year-old Laura, spent much of her time at the
family=s church, Pleasant Glade Assembly of God,
participating in church-related activities. 
Laura collapsed following the evening service on Sunday, June 9, and
several church members, including appellants, felt it necessary to physically
restrain her.  The evidence concerning
the restraint and the events that followed is hotly contested.








The record shows
that, after her collapse, Laura clenched her fists tightly, gritted her teeth,
foamed at the mouth, made guttural noises, cried, yelled, kicked, sweated, and
hallucinated.  The parties sharply disagree,
however, over whether these things were the cause, or the result, of appellants= attempts to restrain her.  The parties also disagree over the amount of force used to
restrain Laura and whether she was restrained for minutes or hours. 

There is evidence that
Laura=s collapse and her reaction to being restrained could
have been due to the medical condition hypoglycemia. Appellants did not know
this at the time, however, and some of them believed that Laura=s actions were a dramatic ploy for attention from members
of the church=s youth group. 
None of appellants sought medical attention for Laura, and there is
conflicting evidence concerning whether any of them attempted to check her
vital signs or determine whether she was feeling all right.  Appellants testified at trial, however, that
they had acted solely out of a desire to help Laura, not hurt her, and that
they had no feelings of ill will or malice towards her. 

Following the
Sunday episode, the next two days passed uneventfully.  Laura continued to participate in
church-related activities, such as Vacation Bible School and preparing for
youth drama productions.  Tom and Judy
Schubert returned home late Tuesday afternoon. 








On Wednesday
evening, Laura attended the church=s
weekly youth service.  Rod Linzay, the
church=s youth pastor, was in charge of the service.  At the close of the service, Laura began to
act in a manner that Linzay and the youth group believed indicated that she was
having another episode like that of the previous Sunday night.  At some point, Laura began thrashing about
on the floor.  Once again, there is
conflicting evidence about whether this was the cause or the result of
appellants= attempts to restrain her, as well as about how long
the restraint lasted and the amount of force used. 

The church=s senior pastor, Lloyd McCutchen, was summoned and
told that ALaura is doing it again.@[2]  At the
prompting of Gene Schacterle, a visiting pastor, McCutchen eventually
telephoned Tom Schubert.  Laura=s parents drove to the church to get her, where they
found her in a condition that Tom described as Adazed.@  They took
Laura to a restaurant for a meal and then drove home. Both Laura and her
parents testified that Laura suffered carpet burns, a scrape on her back, and
bruises on her wrists and shoulders as a result of her experiences.  Laura=s
parents did not, however, seek medical attention for her physical injuries. 








By June 21, Laura
had begun to experience nightmares about her experiences at the church.  In late June 1996, she first visited a
counselor.  In addition, although Laura
had been attending public school before the summer of 1996, she became anxious
and left school on the first day of her senior year in August 1996.  She was authorized to complete her senior
year of high school at home.  Also,
while at work in late October 1996, Laura cut her wrists, although not badly,
with a box cutter after seeing her overwhelming work schedule.  She also reported that she had become
depressed and suicidal because of the June 1996 events at the church. 

In November 1996,
Laura was first diagnosed as suffering from post -traumatic stress disorder
(PTSD). By May 1997, several other doctors had also made this diagnosis and a
diagnosis of acute stress disorder. 
Several of Laura=s doctors testified at trial and opined that Laura=s PTSD was caused by her being held down physically at
the church in early June 1996.








Between the fall of
1996 and the time of trial, Laura saw many different counselors, psychologists,
and psychiatrists and, on a number of occasions, was admitted to psychiatric
institutions for several days.  She
suffered a variety of symptoms, including angry outbursts, weight loss, sleeplessness,
nightmares, hallucinations, self-mutilation, fear of abandonment, and
agoraphobia.[3]  She was also classified as Adisabled@ by
the Social Security Administration and began drawing a monthly disability
check. 

Laura eventually
sued appellants for, among other things, assault and battery and false
imprisonment.  In defense to the suit,
appellants claimed that they were immune from liability under the in loco
parentis doctrine and because they acted as Good Samaritans.  In addition, appellants contended that under
the First Amendment to the United States Constitution and article I, section 6
of the Texas Constitution Laura should be required to prove by clear and
convincing evidence that appellants acted with malice.  Appellants also asserted that they should
not be held responsible for Laura=s
damages because they were not foreseeable. 








The case was tried
to a jury.  At the close of the
evidence, appellants moved for a directed verdict on their defenses and on the
ground that there was no evidence that Laura=s
damages arising from her PTSD were foreseeable as a result of appellants= conduct.  The
motion was overruled.  Appellants then
requested jury instructions on their defenses and on the question of
foreseeability as it related to Laura=s
damages, all of which the trial court denied. 


The jury found
appellants liable for assault and battery and false imprisonment and awarded
Laura damages for past physical pain and mental anguish in the sum of $150,000,
past and future loss of earning capacity in the sum of $122,000, and past and
future medical care in the sum of $28,000, for a total recovery of
$300,000.  After the trial court
overruled appellants= motion for judgment notwithstanding the verdict, this
appeal followed. 

                                          In
Loco Parentis

In their first
issue, appellants complain that the trial court improperly denied their motions
for a directed verdict and for judgment notwithstanding the verdict based on in
loco parentis.  They assert that
they are immune from liability for Laura=s
assault and battery and false imprisonment claims because they stood in loco
parentis as to Laura during the June 1996 incidents and acted with the Areasonable belief@
that their actions were necessary to restrain her.  In the alternative, appellants assert that the trial court erroneously
refused to submit their proposed jury instruction on in loco parentis.  













AIn loco parentis@ literally means Ain the place of a parent@ and refers to Aacting as a temporary guardian or caretaker of a
child, taking on all or some of the responsibilities of a parent.@[4]  In Texas, in
loco parentis status has been conferred on persons and entities who have
voluntarily assumed parental responsibilities and attempted to create a
home-like environment for the child.[5]  A[O]ne
who through kindness or charity or other motive has received into his family
and treats a child as a member thereof, stands in loco parentis . . . so long
as the child remains in his family.@[6]  The defining
characteristics of in loco parentis are the actual care and custody of a
child by a nonparent who assumes parental duties because the parentCgenerally due to his or her absenceCis unable or unwilling to care for the child.[7]  A person who has only a temporary
responsibility for supervising a child, however, is not deemed to be in loco
parentis as to the child.[8]


In this case,
appellants assert that they stood in loco parentis as to Laura on the
occasions in question because Tom and Judy Schubert had entrusted them with
Laura=s care while the Schuberts were out of town; the
church=s youth pastor, Rod Linzay, and his wife Holly,
regularly Aplayed a parental role with respect to the youth group@; and other church members assumed parental
responsibilities for Laura, which Tom Schubert testified that he expected.  These are, however, merely temporary
supervisory situations; they are not the types of circumstances that give rise
to the in loco parentis status.[9]









Further, the record
shows that Laura was primarily responsible for her own care and was not in the
custody of anyone in particular while the Schuberts were out of town.  Although Laura=s parents left Amy Ain charge@ and also expected Laura to spend much of her time at
the church, Laura was responsible for her own meals and getting herself to and
from her retail job and church-related activities.  She also stayed at night in her own home, sometimes with a
friend, unsupervised by any adults. 
Thus, the defining characteristics of in loco parentisCactual care and custodyCare not present in this case.[10]  








The authorities on
which appellants rely are inapposite because they involve either the
teacher-pupil relationship[11]
or defenses to criminal prosecutionCneither
of which is present here.[12]  The teacher-pupil relationship is statutorily
defined and is limited to professional employees of a school district.[13]  Moreover, the fact that conduct is justified
under the penal code does not abolish or impair any remedy for the conduct that
is available in a civil suit.[14]


Because appellants
did not stand in loco parentis as to Laura, the trial court did not err
by overruling their requests based on this doctrine. Accordingly, we overrule
appellants= first issue.

                                         Good
Samaritan

In their second
issue, appellants contend that the trial court erred by denying their motion
for a directed verdict based on the Good Samaritan statute.  This statute provides that a person who in
good faith administers emergency care is not liable in civil damages for an act
performed during the emergency unless the act is wilfully and wantonly
negligent.[15]  It is designed to offer protection to
persons who voluntarily administer emergency care.[16]









Appellants contend
that they administered emergency care to Laura because there is evidence that
her collapse following the Sunday evening service was due to a hypoglycemic
attack.  Appellants= position is contradicted, however, by their trial
testimony that they moved Laura from the church sanctuary, where she had
collapsed initially, to a Sunday School room because they believed her actions
were a dramatic ploy for attention from other members of the youth group.  Several of the appellants testified that
they wanted to remove Laura from the Aaudience@ that was forming in the main sanctuary.  Moreover, there is no evidence that any
emergency continued after appellants moved Laura from the sanctuary to the
Sunday School room.

In addition, the
record does not show that appellants believed the Wednesday evening episode
involved an emergency.  When McCutchen
was summoned on Wednesday evening while Laura was being restrained, he simply
put his hand on her forehead, played a tape of music to calm things down, and
eventually telephoned her father. 








A directed verdict
is proper only in limited circumstances: 
(1) when the evidence conclusively establishes the right of the movant
to judgment or negates the right of the opponent; or (2) when the evidence is
insufficient to raise a material fact issue.[17]  We hold that appellants did not conclusively
establish their right to a directed verdict based on the Good Samaritan
statute.[18]  Accordingly, we overrule appellants= second issue.

                                   Foreseeability
of Damages

In their third
issue, appellants contend that the trial court erred by denying their request
for a directed verdict on the issue of mental anguish and loss of earning
capacity damages because there is no evidence that those damages were
foreseeable.[19]  Alternatively, appellants contend that the
trial court erred by refusing to instruct the jury that Laura=s damages were limited to those that were foreseeable.









At common law,
actual damages are either Adirect@ or Aconsequential.@[20]  In the case
of intentional torts such as assault and battery and false imprisonment, the
wrongdoer is responsible for the direct and immediate damages resulting from
the tort regardless of whether those damages were contemplated, foreseen, or
expected.[21]  Direct damages, also known as Ageneral@
damages, flow naturally and necessarily from the wrong and compensate the
plaintiff for the loss that the defendant is conclusively presumed to have
foreseen as a result of his wrongful act.[22]


Consequential or Aspecial@
damages, on the other hand, result naturally but not necessarily from
the defendant=s wrongful acts.[23]  Unlike direct damages, consequential damages
are not presumed to have been foreseen; instead, they must be premised upon a
finding that the damages were proximately caused by the defendant=s wrongful conduct.[24]









Proximate cause
requires proof of foreseeability.[25]  An injury is foreseeable if its general
character might have been reasonably anticipated.[26]  AEven
an intentional wrongdoer has no liability for remote consequential injuries
that could not have been reasonably anticipated as a probable result of his
acts.@[27] 








Mental anguish
damages shown to have resulted directly from some types of intentional torts,
such as assault and battery, are recoverable regardless of their
foreseeability.[28]  The rationale for this rule is that the
traditionally recognized Aproblems of foreseeability and genuineness are
sufficiently mitigated@ because Athe
high level of culpability [associated with these torts] affects the
determination of proximate cause . . . and makes it just that the defendant
should bear the risk of any overcompensation that an award of mental anguish
damages in a particular case might entail.@[29] 

In this case, there
is evidence that Laura=s mental anguish resulted directly from appellants= intentional acts. 
Several of Laura=s experts, Drs. Roger Pentzien, Arthur Swen Helge, and
Millie Carol Astin, testified that Laura suffered from PTSD and major
depressive disorder, which were caused by her being held down physically at the
church on two occasions in June 1996 when she was exhausted and unable to
contact her parents.  There is also
evidence that Laura=s damages for past and future medical care were the
natural and necessary result of appellants=
wrongful conduct.[30]  Dr. Helge tied Laura=s need for such medical care directly to her PTSD
caused by the June 1996 events.








Because there is
evidence that Laura=s mental anguish and need for medical care resulted
directly from appellant=s intentional conduct, appellants are liable to Laura
for these damages regardless of whether they were contemplated, foreseen, or
expected.[31]  Accordingly, the trial court did not err by
ruling against appellants regarding these elements of Laura=s damages.

We now turn to
appellants= complaint about Laura=s loss of earning capacity damages.








Unlike her mental
anguish damages, Laura=s loss of earning capacity damages are consequential
or special damages.[32]  Therefore, they must be premised upon a
finding that they were proximately caused by, and a foreseeable result of,
appellants= wrongful conduct.[33]  To be held liable for Laura=s lifetime loss of earning capacity, appellants must
have reasonably contemplated that their actions might have resulted in damages
of this general character.[34]  This cannot be established by mere
conjecture, guess, or speculation.[35]









The evidence
supporting Laura=s loss of earning capacity damages shows that she
could not go to Bible college and become a missionary because of the PTSD she
suffered as a result of appellants=
intentional actions in holding her down on the floor on two occasions during
church functions when she was a junior in high school.  Based on these facts, Anothing short of prophetic ken@ could have foreseen that Laura would forever lose the
ability to pursue a college education and a career as a missionary as a result
of appellants= conduct.[36]  On the record before us, the only way
someone could conclude that appellants might have contemplated an injury of
such magnitude would be by Aviewing the
facts in retrospect, theorizing an extraordinary sequence of events whereby the
defendants= conduct brings about the injury.@[37]  A finding of
foreseeablity requires more than this.[38]


Because there is no
evidence that would support a finding that Laura=s loss of earning capacity was foreseeable, there is no evidence that
appellants= conduct was the proximate cause of Laura=s consequential damages for loss of earning capacity.[39]  Thus, the trial court erred by denying
appellants= motion for a directed verdict and awarding Laura
damages for loss of earning capacity.[40]

We sustain
appellants= third issue in part and overrule it in part.

                                        Absence
of Malice

 








In their fourth
issue, Appellants contend that Laura is not entitled to recover mental anguish
damages or the resulting expenses for her medical care under City of Tyler,[41]
because appellants did not act with malice or intend to cause Laura=s injuries. 
Appellants= reliance on City of Tyler is, however,
misplaced.  In City of Tyler, the
supreme court said, A[M]ental anguish damages are recoverable for some
common law torts that generally involve intentional or malicious conduct
such as . . . battery.@[42]  The supreme
court did not hold that a plaintiff who has suffered an intentional tort is
required to prove malice in addition to the defendant=s intentional conduct or that the defendant intended
to cause the plaintiff=s injury.[43]  Because the jury found the requisite intent
to commit the tortious conduct causing Laura=s
mental anguish and other damages, neither the appellants= good motives nor their erroneous beliefs that they
were acting rightfully excuse them from liability.[44]


We overrule
appellants= fourth issue.

 

 








                                  Reliability of PTSD Evidence

 








In their fifth and
sixth issues, appellants assert that the trial court improperly admitted
certain medical records and expert testimony showing that Laura suffered from
PTSD as a result of the events of June 1996. 
Appellants assert that this evidence lacks the scientific reliability
required by E.I. du Pont de Nemours & Co. v. Robinson[45]
and the Texas Rules of Evidence.[46]  In particular, appellants argue that the
expert opinions of Drs. Roger Pentzien, Arthur Swen Helge, and Millie Carol
Astin are based on unreliable data because virtually all of the information was
provided by Laura or her family, whom the record shows to be prone to
exaggeration and fabrication. 
Appellants also contend that the opinions are unreliable because the
experts failed to rule out Laura=s
traumatic childhood experiences in Africa as a possible cause of her PTSD.[47]


If scientific,
technical, or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue, a witness qualified as
an expert by knowledge, skill, experience, training, or education may testify
thereto in the form of opinion or otherwise.[48]  A two‑part test governs whether expert
testimony is admissible:  (1) the expert
must be qualified; and (2) the testimony must be relevant and be based on a
reliable foundation.[49]









To gauge
reliability, the trial court must evaluate the methods, analysis, and
principles relied upon in reaching the opinion.[50]  The trial court should ensure that the
opinion comports with applicable professional standards outside the courtroom
and that it will have a reliable basis in the knowledge and experience of the
discipline.[51]  In determining reliability, however, the
trial court does not decide whether the expert=s conclusions are correct, but only whether the analysis used to reach
those conclusions is reliable.[52]


If the foundational
data underlying opinion testimony are unreliable, an expert will not be
permitted to base an opinion on the data because any opinion drawn from that
data is likewise unreliable.[53]  Further, an expert=s testimony is unreliable even when the underlying
data are sound if the expert draws conclusions from the data based on flawed
methodology.[54] 








The supreme court
has crafted two approaches for determining whether expert testimony is
reliable:  the Robinson factors
and the Gammill analytical gap test.[55]  Only the Robinson factors are at
issue here.  These factors include, but
are not limited to  (1) the extent to
which the theory has been or can be tested, (2) the extent to which the
technique relies upon the subjective interpretation of the expert, (3) whether
the theory has been subjected to peer review and/or publication, (4) the
technique=s potential rate of error, (5) whether the underlying
theory or technique has been generally accepted as valid by the relevant
scientific community, and (6) the nonjudicial uses that have been made of the
theory or technique.[56]  Expert testimony that is based on research
the expert has conducted independent of the litigation provides important,
objective proof that the research comports with the dictates of good science.[57]









The trial court has
broad discretion to determine admissibility, and we will not reverse the trial
court=s ruling absent a clear abuse of that discretion.[58]  A trial court abuses its discretion only if
it acts arbitrarily and capriciously, without reference to any guiding rules or
principles.[59]  Merely because a trial court may decide a
matter within its discretion in a different manner than an appellate court
would in a similar circumstance does not demonstrate that an abuse of
discretion has occurred.[60]


The evidence
concerning the reliability of Dr. Helge=s,
Dr. Astin=s, and Dr. Pentzien=s
expert testimony is as follows.








Dr. Helge, a
clinical and forensic psychologist, had over twenty-five years= experience diagnosing mental diseases and disorders
and had conducted seminars and published articles related to his
profession.  He had also testified at
more than two hundred trials and given over a hundred depositions.[61]  Dr. Helge opined that Laura suffered from a
dependent personality disorder[62]
and that her being touched and held down against her will on the two occasions
in June 1996 when she was exhausted and not able to contact her parents were
the cause of her PTSD. 

Dr. Helge conceded
that Laura or her family had been the source of all the information he had
relied upon in making these diagnoses, either through their self-reporting to
him or other mental health professionals, or Laura=s responses to the tests that he had conducted.  But Dr. Helge testified that this was Athe way it=s
normally done@ in the psychological community and pointed out that
he had also reviewed Laura=s medical
records and relied on the expertise of the other experts who had interviewed
her.  Moreover, Dr. Helge testified that
he had conducted standard psychological testing on Laura, along with a Psychiatric
Diagnostic Interview (PDI-R) and a clinical interview, which were consistent
with the standard and practice for clinical psychology.  








Dr. Helge also
listed seven specific tests that he had performed on Laura. According to Dr.
Helge, the tests had been subjected to peer review, published in professional
literature, accepted as valid testing instruments within the psychological
community, and used in court situations. 
Several of the tests had been used and revised since the 1950s; others
were introduced in the 1980s. He relied on the results from four of these
tests, the MMPI-II, MCRI, TAT, and TSI,[63]
along with the PDI-R and Laura=s medical
records from other doctors, in making his diagnoses. 

Dr. Helge explained
that, while psychological testing does not identify the specific incidents that
caused a person=s PTSD, the tests do identify the fact that an event
traumatic to an individual occurred and its characteristics.  For example, Dr. Helge testified that the
TAT tests a person=s feelings or attitudes about certain situations, and
the TSI determines sources of situations in which the person expresses unusual
symptoms of trauma at a point in time. 
Further, Dr. Helge explained that, although there is always a measure of
subjective interpretation associated with the tests he conducted, the tests
also involved objective data with objective norms. 








Dr. Pentzien, a
practicing neuropsychiatrist with twenty-six years= experience, also diagnosed Laura as suffering from
PTSD and major depressive disorder caused by the events of June 1996.  Dr. Pentzien opined that nothing that had
happened in Laura=s life before the June 1996 events, including the
Schubert family=s experiences in Africa,[64]
would have caused these disorders. Dr. Pentzien stated that, due to Laura=s conflicting recounting of her history, he would want
to see more information before rendering an opinion for the jury to base its
verdict on.  But he further testified
that the rate of error for the methodology he had used in making his diagnoses
was one in ten thousand, which is generally accepted throughout the scientific
community as reliable. Dr. Astin had
eight years of experience as a clinical psychologist.  She specialized in trauma disorders such as PTSD, had authored
articles and book chapters on PTSD, had taught courses on the psychology of
victims and the assessment of PTSD, and had made numerous conference
presentations on PTSD.[65]









In May 2001, Dr.
Astin diagnosed Laura as suffering from PTSD and major depression.  She testified that these diagnoses had not
changed after twenty-five treatment sessions and additional testing.  Although she was aware of Laura=s experiences in Africa and was of the opinion that Ahorrible experiences@ in a person=s childhood could affect her later in life, Dr. Astin
opined that the cause of Laura=s PTSD and
depression was related to the June 1996 incidents. 

Dr. Astin testified
that, in making her diagnoses, she had administered several standardized tests
to Laura that are generally accepted as valid in the field of psychology for
determining whether a person is suffering from PTSD and depression, and if so,
with what intensity. 

Further, Dr. Astin
acknowledged that much of the information she used in making her PTSD diagnosis
had been provided by Laura herself.  But
Dr. Astin listed several methods that she used to ensure that LauraCor any other patientCwas not Apulling the wool over her eyes.@  First, Dr.
Astin relied on her clinical skills and experience.  She also asked Laura to give her detailed descriptions of each of
the symptoms Laura claimed to be having related to PTSD and depression (such as
flashbacks, for example), so that she could determine whether Laura was
actually experiencing the symptoms. 








Dr. Astin explained
that she had done extensive PTSD research and knew from experience that a lot
of people wanted to participate in research studies for financial gain.  According to Dr. Astin, these people would Aoverendorse,@ or
report very high PTSD symptom levels that were inconsistent with their
behavior.  Over time, Dr. Astin examined
these individuals= detailed, repeated self-reporting about their alleged
symptoms and behavior to see if they were consistent with PTSD.  If, based on her extensive clinical training
and experience, she determined that a particular patient was overendorsing
symptomology consistent with PTSD, but was not actually suffering from it, she
would reject the patient from her research studies.  She followed the same process with Laura during twenty-five visits
and, as a result, Ahad no sense@
that Laura was trying to lie. 








Finally, in
addition to a regular clinical interview, Dr. Astin conducted a standardized
clinical interview, known as CAPS,[66]
that, in a Avery structured way@
required her patients, including Laura, to provide specific, detailed
information regarding each of the seventeen possible criteria for PTSD listed
in the DSM-IV.[67]  She explained that the standardization meant
that every clinician who administered CAPS to a patient conducted it according
to the same format, thereby enabling clinicians to better determine the
validity of the responses received and lending greater credence to their
resulting diagnoses.  Dr. Astin stated
that CAPS had been developed in the 1980s as a result of research on potential
PTSD sufferers by nationally and internationally known experts and peer-reviewed
by experts in PTSD and trauma, some of whom had also written the DSM-IV.  Dr. Astin stated that trauma experts
considered CAPS to be Astate-of-the art@
and the Agold standard@
for diagnosing PTSD or eliminating it as a diagnosis. 

Appellants assert
that Dr. Astin=s methodology was not reliable because it was Aunusual@
and Aquite strange.@  To support their position, appellants assert
that Dr. Astin employed Aan unusual form of clinical practice@ that most mental health professionals do not
recognize:  Eye Movement Desensitization
and Reprocessing (EMDR).  Appellants
also assert that Dr. Astin admitted she had treated so many traumatized women
that she had been Avicariously traumatized@ herself and experienced PTSD symptoms.  Based on our review of the record, we cannot agree with
appellants= characterization of Dr. Astin=s methodology.








First, there is no
evidence that Dr. Astin employed EMDR in diagnosing Laura=s condition; instead, Dr. Astin testified that she had
used this and other techniques in treating Laura.  Dr. Astin testified that EMDR is a therapy
technique that involves asking a person to bring up some aspect of a traumatic
memory, along with the negative thoughts that have developed as a result of it,
while watching the therapist=s fingers move
back and forth in front of the patient=s
eyes.  Dr. Astin=s personal opinion, however, was that the eye
movements were just a way to distract the person while thinking about the
trauma, therefore making it less aversive to do so. 








Dr. Astin further
testified that EMDR was generally accepted in the scientific community, but
remained controversial because the inventor of the technique was a
controversial person.  She explained
that there had been little good research on EMDR at first, but that seven
recent, Avery well controlled studies@ had shown EMDR to be highly effective.  As a result, this technique had been
endorsed, although not promoted, by the Society for Traumatic Stress Studies[68]Ca well-respected organization of mental health
providers, including psychologists and psychiatrists, and Avirtually all@ of
the members of the national centers for PTSD established by the federal
government.  Dr. Astin testified that
large numbers of clinicians were now using it, and she provided the trial court
with two articles about EMDR that explained why it was valid.         Regarding vicarious traumatization, Dr.
Astin acknowledged that, early in her career, she had experienced symptoms of
this phenomenon, which is well recognized in the field of psychology.  Dr. Astin testified that, several years
before Laura became her patient, she had written an article about her
experiences.  She also testified that
she had recognized how to prevent these feelings and symptoms, no longer had
them, and had never been treated for them. 
Finally, Dr. Astin testified that vicarious traumatization had not
affected her diagnosis of Laura in any way. 

Despite all of this
evidence of reliability, appellants assert that these experts= testimony concerning Laura=s PTSD diagnosis is unreliable because the experts
made the diagnosis without conducting any rate-of-incidence studies or
objective medical tests, such as imaging technology or blood work, or reviewing
results of similar cases of restraint. 
Appellants further assert that Laura=s
MMPI-II score showed she was Afaking bad,@ that is, exaggerating her symptoms. 








Appellants do not
direct us to any expert testimony that these tests should have been conducted
or would have assisted in a determination of the cause of Laura=s PTSD.[69]  Further, regarding rate-of-incidence
studies, Dr. Helge testified that he did not know of any case studies examining
the incidence of PTSD arising from Laura=s
type of situation. 

Regarding medical
tests, Dr. Pentzien testified that a blood test and neuroimaging technique were
available to serve as additional tools in diagnosing mental disorders.  He further testified, however, that the
tests had not been conducted because they were not specific enough to
distinguish between particular types of disorders.  In addition, Dr. Pentzien testified that the neuroimaging
technique was not sufficiently standardized to be generally accepted as
reliable in the field of neuropsychiatry. 
Likewise, Dr. Astin testified that she knew of no literature in the
field of psychotherapy that suggested a blood test or brain scan could be
specific enough to reveal PTSD. 

Drs. Astin and
Helge conceded that Laura=s MMPI-II score showed she was Afaking bad.@  But they interpreted Laura=s particular score as consistent with a Acry for help,@
meaning that she was embellishing her symptoms somewhat in order to be heard,
not that she was claiming to have symptoms that did not exist.  Dr. Pentzien testified that, while he
considered the MMPI-II helpful in making a diagnosis, he was not trained in the
field of psychometrics[70]
and therefore was not qualified to interpret the MMPI-II test results. 








Having conducted a
careful review, we conclude that, although the record shows that the methods
and analyses that Drs. Helge, Astin, and Pentzien relied upon in formulating
their diagnoses involved some subjective interpretation, the record also shows
that these methods and analyses had a rate of error generally accepted in the
scientific community as reliable, had been accepted as valid in the scientific
community for decades, had been subject to extensive peer review and
publication, and had been widely used for nonjudicial purposes.[71]  Accordingly, we hold that the trial court
did not abuse its discretion by concluding that these experts= opinion testimony was reliable and therefore
admissible.[72]

We overrule
appellants= fifth and sixth issues.

 

 

 








                                         First
Amendment








In their seventh
and eighth issues, appellants complain that the trial court erred by failing to
give them the benefit of certain protections against Laura=s claims under the First Amendment of the United
States Constitution.[73]  Specifically, appellants contend that a
clear and convincing proof of malice requirement similar to that which the
United States Supreme Court has applied to libel actions under the Free Speech
Clause should be applied to Laura=s
claims[74]
and that the judgment against them should be reversed because the evidence
conclusively establishes that they did not act with malice.  In the alternative, appellants assert that
the case should be remanded for a new trial because the trial court erred in
refusing to submit jury instructions on the issue of malice and the clear and
convincing evidentiary standard.

In a prior original
proceeding, appellants sought, based on the First Amendment, a writ of mandamus
ordering the trial court to dismiss all of the Areligious@ claims that had been brought by Laura and her
parents.[75]  In the same proceeding, appellants requested
that we allow Laura=s claims for assault and battery and false
imprisonment Ato go forward@
because, in the words of appellants=
attorney of record and Reverend McCutchen stated under oath, these claims
constitute Aa >secular
controversy= and do[] not come within the protection of the First
Amendment.@  Appellants
averred that Ano church or pastor can use the First Amendment as an
excuse to cause bodily injury to any person,@
and represented that Ano religious beliefs would be implicated@ if Laura=s Apure >bodily
injury=@ claims of assault and battery and false imprisonment
were litigated.[76]








We granted the
relief appellants requested and held that all of the challenged Areligious@
claims were barred by the First Amendment.[77]  Thereafter, trial proceeded on Laura=s assault and battery and false imprisonment claims
with all of the appellants= acquiescence.[78]













Having obtained, in
the prior mandamus proceeding, the dismissal of all but Laura=s assault and false imprisonment claims, which they
swore under oath should Ago forward@
because they were purely secular and entitled to no First Amendment
protections, appellants cannot now Aplay
fast and loose@ with the judicial system by taking the opposite
position in this appeal to suit their own purposes.[79]  We therefore hold that the church and
pastors are estopped[80]
from asserting in this appeal that they are entitled to First Amendment
protections with regard to Laura=s
assault and false imprisonment claims. Accordingly, we overrule appellants= seventh and eighth issues.[81]

                              Course and Scope
of Employment

 

In their ninth and
tenth issues, appellants contend that the trial court erred in concluding, as a
matter of law, that McCutchen and Rod Linzay were acting in the scope and
course of their employment during the June 1996 incidents.  Appellants assert that rendition of judgment
against the church absent a jury finding on this issue was improper.








Appellants have not
briefed these issues.[82]  Further, appellants admit that McCutchen and
Linzay Awere in the course and scope of their work for the
Church during the times in question.@  Therefore, we overrule appellants= ninth and tenth issues.

                                             Conclusion

Having disposed of
all of appellants= issues, we reverse the trial court=s judgment awarding Laura $122,000 in damages for loss
of earning capacity and render judgment that she take nothing on this damages
claim.  We affirm the remainder of the
trial court=s judgment.

 

JOHN CAYCE

CHIEF JUSTICE

 

PANEL A:   CAYCE,
C.J.; LIVINGSTON and WALKER, JJ.

 

LIVINGSTON, J. dissents in part without opinion as to
issue three.

 

DELIVERED: September 15, 2005











[1]Appellants are Pleasant Glade Assembly of God church,
Reverend Lloyd A. McCutchen, Rod Linzay, Holly Linzay, Sandra Smith, Becky
Bickel, and Paul Patterson.





[2]McCutchen had not been present during the Sunday
evening episode, but had been told about it. 





[3]Agoraphobia is the abnormal fear of being helpless in
an embarrassing or inescapable situation that is characterized by the avoidance
of being in public places.  Merriam Webster=s Collegiate Dictionary 24 (10th ed. 1994).





[4]Black=s Law Dictionary 803 (8th ed. 1999). 





[5]See McGee v. McGee, 936 S.W.2d 360, 369-70 (Tex. App.CWaco
1996, writ denied) (op. on reh=g) (holding
that stepfather stood in loco parentis because he had cared for child
from early childhood and was the only father child had ever known); Goetz v.
Lutheran Social Serv. of Tex., Inc., 579 S.W.2d 82, 83 (Tex. Civ. App.CAustin 1979, no writ) (holding that children=s home had in loco parentis status and
appointing home as child=s managing conservator after parental rights were
terminated); Malone v. Dixon, 410 S.W.2d 278, 285 (Tex. Civ. App.CEastland 1966, writ ref=d n.r.e.) (concluding that orphanage stood in loco parentis as
to child after his aunt placed him there following his parents= death); Trotter v. Pollan, 311 S.W.2d 723, 729
(Tex. Civ. App.CDallas) (deeming couple in loco parentis to
child who lived for years in their home with no financial assistance from child=s father and whom they voluntarily cared for and
treated as their own), writ ref=d n.r.e. per curiam, 158 Tex.
494, 313 S.W.2d 603 (1958); Cantu v. S. Pac. Ry. Co., 166 S.W.2d 963,
965 (Tex. Civ. App.CAmarillo 1942, writ ref=d) (holding couple stood in loco parentis to child whose parents
had committed to couple child=s care,
custody, and child-rearing responsibilities from age 15 months until child=s death ten years later).





[6]Trotter, 311
S.W.2d at 729; accord McGee, 936 S.W.2d at 369. 





[7]Coons‑Andersen v. Andersen, 104 S.W.3d 630, 635-36 (Tex. App.CDallas 2003, no pet.). 





[8]See In re Martin, 147 S.W.3d 453, 456 (Tex. App.CBeaumont
2004, orig. proceeding) (holding that child=s
uncle, who was temporarily responsible for babysitting child, was not entitled
to in loco parentis status).





[9]See id.
& supra n.5.





[10]See Coons‑Andersen, 104 S.W.3d at 635-36.





[11]See Spacek v. Charles, 928 S.W.2d 88, 95 (Tex. App.CHouston [14th Dist.] 1996, writ dism=d w.o.j.); Hogenson v. Williams, 542
S.W.2d 456, 459-60 (Tex. Civ. App.CTexarkana
1976, no writ) (both involving athletic coaches and students and citing Restatement (Second) of Torts '' 147, 150-51 (1965)).





[12]See Tex. Penal Code Ann. ' 9.61(b) (Vernon 2003) (providing that adult can stand
in loco parentis as to child by express or implied consent of child=s parents),'
9.62(1) (providing that use of nondeadly force against a person is justified
(1) if actor is entrusted with the care, supervision, or administration of the
person for a special purpose, (2) when and to the degree actor reasonably
believes necessary to further special purpose or to maintain discipline in a
group); see also Snowden v. State, 12 Tex. Ct. App. 105, 105, 1882 WL
9200, at *2 (1882) (holding that brother who provided home and financial
support to his 15-year-old sister could assert in loco parentis defense
to criminal prosecution for shoving her).





[13]See Tex. Educ. Code Ann. '' 22.051, .0511 (Vernon Supp. 2004-05). 





[14]See Tex. Penal Code Ann. ' 9.06 (Vernon 2003); J.
Hadley Edgar, Jr. & James B. Sales, 4 Texas Torts & Remedies ' 50.04[1] (2005).





[15]See Act of
May 22, 1993, 73rd Leg., R.S., ch. 960, ' 1,
1993 Tex. Gen. Laws 4194, 4194 (amended 1999, 2003) (current version at Tex. Civ. Prac. & Rem. Code Ann. ' 74.151(a) (Vernon 2005)).





[16]Rosell v. Cent. W. Motor Stages, Inc., 89 S.W.3d 643, 658 (Tex. App.CDallas 2002, pet. denied).





[17]Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000); Ray v. McFarland,
97 S.W.3d 728, 730 (Tex. App.CFort Worth
2003, no pet.); see also Tex. R.
Civ. P. 268. 





[18]Prudential Ins. Co. of Am., 29 S.W.3d at 77; Ray, 97 S.W.3d at 730. 





[19]The jury awarded Laura actual damages for past
physical pain and mental anguish, past and future loss of earning capacity, and
past and future medical care.  The
damages for past physical pain and mental anguish are not segregated. 





[20]5 Texas Torts
& Remedies ' 80.01[2] (2005).





[21]See Sitton v. Am. Title Co. of Dallas, 396 S.W.2d 899, 903-04 (Tex. Civ. App.CDallas 1965, writ ref=d n.r.e.), cert. denied, 385 U.S. 975 (1966); Thompson v.
Hodges, 237 S.W.2d 757, 759 (Tex. Civ. App.CSan Antonio 1951, writ ref=d
n.r.e.).  





[22]5 Texas Torts & Remedies ' 80.01[2][a].





[23]Id. '
80.01[2][b]. 





[24]See Airborne Freight Corp., Inc. v. C.R. Lee Enters.,
Inc., 847 S.W.2d 289, 295 (Tex. App.CEl Paso 1992, writ denied) (discussing consequential
damages in context of common law fraud cause of action).





[25]Doe v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995); Travis
v. City of Mesquite, 830 S.W.2d 94, 98 (Tex. 1992); see also Clark v.
Waggoner, 452 S.W.2d 437, 438 (Tex. 1970) (AIn our State the two elements of proximate cause are cause in fact and
foreseeablity.@). 





[26]Boys Clubs of Greater Dallas, 907 S.W.2d at 478; Nixon v. Mr. Property Mgmt. Co.,
690 S.W.2d 546, 551 (Tex. 1985). 





[27]See Phillips
v. Latham, 523 S.W.2d 19, 27 (Tex. Civ. App.CDallas 1975, writ ref=d n.r.e.) (holding
mental anguish damages too remote to recover on basis of intentional tort claim
for civil conspiracy); Sitton, 396 S.W.2d at 903-04 (same).





[28]See Fisher v. Carrousel Motor Hotel, Inc., 424 S.W.2d 627, 630 (Tex. 1967) (holding that A[p]ersonal indignity is the essence of an action for
battery@); Durban v. Guajardo, 79 S.W.3d 198, 206 (Tex.
App.CDallas 2002, no pet.) (holding that emotional distress
is Athe essence@ of
assault claim); see also Dillard Dep=t Stores, Inc. v. Silva, 148 S.W.3d 370, 372 (Tex. 2004) (affirming award of
actual mental anguish damages when there was legally sufficient evidence of
false imprisonment). 





[29]City of Tyler v. Likes, 962 S.W.2d 489, 495 (Tex. 1997); see also
Fitzpatrick v. Copeland, 80 S.W.3d 297, 302 & n.2 (Tex. App.CFort Worth 2002, pet. denied).





[30]See 5 Texas Torts & Remedies ' 80.01[2][a]. 





[31]See Sitton,
396 S.W.2d at 903-04; Thompson, 237 S.W.2d at 759. 





[32]See Weingartens,
Inc. v. Price, 461 S.W.2d 260, 264 (Tex. Civ. App.CHouston [14th Dist.] 1970, writ ref=d n.r.e.) (ALoss
of earnings and loss of earning capacity are items of >special damages.=@).






[33]Boys Clubs of Greater Dallas, 907 S.W.2d at 477; City of Mesquite, 830 S.W.2d
at 98; Airborne Freight Corp., 847 S.W.2d at 295. 





[34]County of Cameron v. Brown, 80 S.W.3d 549, 556 (Tex. 2002). Foreseeablity does
not require that the exact sequence of events that produce an injury be
foreseeable, but only that the general character of the damages be
foreseen.  Id.; Boys Clubs of
Greater Dallas, 907 S.W.2d at 478;  Nixon,
690 S.W.2d at 551.





[35]Boys Clubs of Greater Dallas, 907 S.W.2d at 477; McClure v. Allied Stores of
Tex., Inc., 608 S.W.2d 901, 903 (Tex. 1980).





[36]See Gulf, C. & S.F. Ry. Co. v. Bennett, 110 Tex. 262, 219 S.W. 197, 198 (1920). 





[37]Restatement (Second)
of Torts ' 435(2) (1965). 





[38]See Boys
Clubs of Greater Dallas, 907 S.W.2d at 478.





[39]See id.
(holding that when there is no evidence raising a fact issue on foreseeablity,
there is no evidence to support a finding of proximate cause); Phillips,
523 S.W.2d at 26-27 (holding that because there was no competent evidence that
plaintiff=s illnesses could have been reasonably foreseen, there
was no causal relation between defendants=
intentional acts and plaintiff=s injuries). 





[40]Because there is no evidence to support a finding that
Laura=s loss of earning capacity damages were proximately
caused by appellants= conduct, we do not reach appellants= alternative issue regarding whether the trial court
erred in failing to submit a separate damages question asking whether Laura=s loss of earning capacity was proximately caused by
appellants= conduct.





[41]962 S.W.2d at 489.





[42]Id. at 495
(emphasis supplied); accord Fitzpatrick, 80 S.W.3d at 302 & n.2
(noting that mental anguish damages are recoverable for intentional tort of
battery because legal concerns regarding foreseeability and legitimacy of
injury are satisfied). 





[43]City of Tyler,
962 S.W.2d at 495. 





[44]See Dan B. Dobbs, The Law of Torts ' 25, at 49-50 (2001).





[45]923 S.W.2d 549 (Tex. 1995).





[46]Appellants also complain in passing that this evidence
was inadmissible because it was not based on a reasonable medical
probability.  We do not address this
complaint because it is not briefed.  See
Tex. R. App. P. 38.1(h).





[47]The record contains conflicting evidence concerning
whether Laura=s experiences in Africa were traumatic.  Some of Laura=s medical records indicate that she had seen Atraumatic events@
such as Abeatings and burnings@ while her family lived as missionaries in Africa.  The record is unclear, however, whether
these records are based on Laura=s
or Tom Schubert=s recounting of events. Also, Tom authored two letters
in 1992 and 1996, respectively, regarding the family=s alleged experiences in Africa that indicated Laura
had faced Afear and danger in Africa@ that Awas more than
any child should ever see or face.@  Tom testified at trial, however, that he had
exaggerated in the letters Aalmost to the
point of lying@Conce to obtain leave from Africa from the mission
board due to his children=s difficulties in school and another to emphasize how
the events of June 1996 had hurt Laura more deeply than her experiences in
Africa.  Laura denied having suffered
any traumatic experiences in Africa and testified instead that Africa was Aan amazing place@
where she would prefer to raise her daughter. 





[48]Tex. R. Evid. 702.





[49]Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex. 2001); Robinson, 923
S.W.2d at 556.





[50]Exxon Pipeline Co. v. Zwahr, 88 S.W.3d 623, 629 (Tex. 2002); Gammill v. Jack
Williams Chev., Inc., 972 S.W.2d 713, 725 (Tex. 1998). 





[51]Helena Chem. Co., 47 S.W.3d at 499; Gammill, 972 S.W.2d at 725-26.





[52]Exxon Pipeline Co., 88 S.W.3d at 629; Gammill, 972 S.W.2d at 728.





[53]Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 714 (Tex. 1997). 





[54]Id.





[55]Gammill, 972
S.W.2d at 720, 726.





[56]Robinson,
923 S.W.2d at 557.





[57]Id. n.2.





[58]Exxon Pipeline Co., 88 S.W.3d at 629; Helena Chem. Co., 47 S.W.3d at 499; Reed
v. Granbury Hosp. Corp., 117 S.W.3d 404, 410 (Tex. App.CFort Worth 2003, no pet.). 





[59]See Carpenter v. Cimarron Hydrocarbons Corp., 98 S.W.3d 682, 687 (Tex. 2002); Downer v.
Aquamarine Operators, Inc., 701 S.W.2d 238, 241‑42 (Tex. 1985), cert.
denied, 476 U.S. 1159 (1986). 





[60]Downer, 701
S.W.2d at 242.





[61]Appellants do not challenge the qualifications Drs.
Helge and Pentzie. Instead, appellants acknowledged that these doctors were
qualified as experts and also designated them as their own experts regarding
certain of their diagnoses concerning Laura. 





[62]According to Dr. Helge, a dependent personality is one
that trusts another person=s judgment,
rather than her own, particularly when under stress. 





[63]These tests are the Minnesota Multiphasic Personality
Inventory-2, Millon Clinical Multiaxial Inventory-III, Thematic Apperception
Test, and Traumatic Symptom Inventory, respectively. 





[64]Dr. Pentzien believed Tom Schubert had embellished the
family=s situation in Africa because he was concerned about
Laura=s lack of adjustment. Dr. Pentzien also discounted
Laura=s Africa experiences as a source of her PTSD because
she had adjusted well academically, socially, and physically and had behaved Atotally independently@ after the family=s return to the United States in late 1992, about
three-and-a-half years before the June 1996 incidents. 





[65]Although they did not object to Dr. Astin=s qualifications at trial, appellants assert that her
testimony is not reliable because her credentials are suspect.  Appellants= attacks on Dr. Astin=s credentials
are not supported by the record. 





[66]CAPS stands for Clinician Administered PTSD Scale. 





[67]The DSM-IV is the Diagnostic Statistical Manual, 4th Revision.






[68]Dr. Astin explained that Aendorsing@
meant STSS had concluded there was good evidence EMDR was effective, while Apromoting@
would have including prompting from STSS to use the treatment. 





[69]See Tex. R. App. P. 38.1(h); Hall v.
Stephenson, 919 S.W.2d 454, 466 (Tex. App.CFort Worth 1996, writ denied) (both providing that appellant has duty
to provide appellate court appropriate citations to record). 





[70]Psychometrics is the testing and interpretation of
psychological tests. 





[71]See Robinson,
923 S.W.2d at 557.





[72]See Carpenter,
98 S.W.3d at 687; Exxon Pipeline Co., 88 S.W.3d at 629; Helena Chem.
Co., 47 S.W.3d at 499; Downer, 701 S.W.2d at 241‑42. In light
of this holding, we need not consider appellants= complaint that the trial court summarily overruled their objection to
the admission of Laura=s medical records from nontestifying experts regarding
their PTSD diagnoses.  Such evidence,
even if improperly admitted, would have been cumulative and would not have
caused the rendition of an improper judgment. 
See Tex. R. App. P.
44.1(a).





[73]The Free Exercise Clause to the First Amendment
provides, ACongress shall make no law . . . prohibiting the free
exercise@ of religion.  U.S. Const. amend. I.  Appellants also assert a claim under the
Free Worship Clause, article I, section 6 of the Texas Constitution, but they
do not argue that the Texas Constitution affords them different or greater
protection than the First Amendment.





[74]See Dun & Bradstreet, Inc. v. Greenmoss Builders,
Inc., 472 U.S. 749, 763, 105 S. Ct.
2939, 2947 (1985) (indicating that damages in defamation cases involving
matters of public concern are not presumed absent showing of actual malice);
N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80, 285-86, 84 S. Ct. 710,
726, 729 (1964) (applying actual malice and heightened evidentiary standard to
free speech cases involving governmental officials); see also Turner v. KTRK
Television, Inc., 38 S.W.3d 103, 120 (Tex. 2000) (applying same to public
figures).  Malice is not an element of
the intentional torts of assault and battery or false imprisonment under current
Texas law.  See Wal-Mart Stores v.
Rodriguez, 92 S.W.3d 502, 506 (Tex. 2002); Baribeau v. Gustafson,
107 S.W.3d 52, 60 (Tex. App.CSan Antonio
2003), cert. denied, 125 S. Ct. 272 (2004); Green v. Indus. Specialty
Contractors, Inc., 1 S.W.3d 126, 134 (Tex. App.CHouston [1st Dist.] 1999, no pet.).





[75]See In re Pleasant Glade Assembly of God, 991 S.W.2d 85, 87-88 (Tex. App.CFort Worth 1998, orig. proceeding).





[76]Appellants have asked us to take judicial notice of
our records in the original proceeding. 
A court may take judicial notice of its own records, see Brown v.
Brown, 145 S.W.3d 745, 750 (Tex. App.CDallas
2004, pet. denied), and such notice is mandatory if a party requests it and
supplies the necessary information.  See
Tex. R. Evid. 201(d).





[77]Pleasant Glade Assembly of God, 991 S.W.2d at 87, 90. 





[78]For example, before trial began, appellants= counsel responded AOkay@ to the trial court=s
ruling that neither side would be allowed to put on evidence about appellants= religious practices as a reason for Laura=s restraint. 
The trial court also instructed the jury at the beginning of trial that,
because the suit involved a church, the First Amendment would bar the parties
from explaining why certain things were said and done during the June 1996
incidents.  Appellants did not object to
this instruction.  Likewise, when the
trial court instructed various witnesses not to mention religious matters, such
as prayer, or instructed the jury to disregard testimony concerning religious
matters, appellants did not object to these rulings.  In addition, at appellants=
request, the trial court instructed one of Laura=s expert witnesses to refrain from referring to all issues of faith or
religious activity that may have been connected with the June 1996 incidents. 





[79]Andrews v. Diamond, Rash, Leslie & Smith, 959 S.W.2d 646, 649 (Tex. App.CEl Paso 1997, pet. denied); see also Long v. Knox,
155 Tex. 581, 291 S.W.2d 292, 295 (1956). 






[80]Whether appellants=
actions are labeled as waiver or judicial estoppel is immaterial.  See Jernigan v. Langley, 111 S.W.3d
153, 156-57 (Tex. 2003) (noting that waiver is defined as Aan intentional relinquishment of a known right or
intentional conduct inconsistent with claiming that right@); Long, 291 S.W. at 295 (AUnder the doctrine of judicial estoppel . . . a party
is estopped merely by the fact of having alleged or admitted in his pleadings
in a former proceeding under oath the contrary to the assertion sought to be
made.@).  What is
clear is that courts, faced with burgeoning dockets, are entitled to rely on
prior sworn statements of parties and counsel such as those in this case.  See Ergo Sci. Inc. v. Martin, 73 F.3d
595, 599-600 (5th Cir. 1996); see also Cleaver v. Cleaver, 140 S.W.3d
771, 774-75 (Tex. App.CTyler 2004, no pet.) (stating that, under federal law,
judicial estoppel does not require a prior sworn statement, but only that party
successfully maintained an affirmative position in a prior proceeding that is
contrary to the position it now seeks to invoke).





[81]On rehearing, Smith, Bickel, and Patterson
(collectively, the church members) argue that they are entitled to First
Amendment protection because they did not participate in the prior mandamus
proceeding.  The church members have,
however, waived their right to assert this affirmative defense because they did
not establish in the trial court that their assault and imprisonment of Laura
was based on their sincerely held religious beliefs.  See Tilton v. Marshall, 925 S.W.2d 672, 677-78 (Tex. 1996)
(orig. proceeding) (ABefore a court can determine whether a law . . .
substantially burdens one=s free exercise rights [and entitles the person to
First Amendment protection], the individual must establish by a preponderance
of the evidence that the beliefs avowed are not only religious in nature, but
sincerely held.@).  To the
contrary, the church members each testified that their conduct arose from their
belief that Laura=s actions were a ploy for attention from other members
of the youth group.  The church members= reliance on McCutchen=s pretrial affidavit concerning some of their denomination=s religious beliefs is misplaced.  The affidavit does not establish by a
preponderance of the evidence that the church members themselves sincerely held
those beliefs or that their conduct in this case was based on those
beliefs.  See id.  





[82]See Fredonia State Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284 (Tex. 1994) (noting long-standing
rule that point may be waived due to inadequate briefing).